Vivian G. **BERNSTEIN, as custodian for Jamie A. Bernstein, Karen Kaun, Duncan Hoffman, John Papastamatakis, and Lawrence Lyon, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**CRAZY EDDIE, INC., Eddie Antar, Sam Antar, Mitchell Antar, Eddy Antar, Sam E. Antar, Solomon E. Antar, David V. Panoff, Isaac Kairey, Steve Pasquariello, William H. Saltzman, James H. Scott, Jr., Edmond Levy, Carl G. Zimel, David Pardo, Peat Marwick Main & Co., Oppenheimer & Co., Inc., Wertheim & Co., Inc., Bear Stearns & Co., Inc., and Salomon Brothers, Inc., Defendants.**

**CRAZY EDDIE, INC., Third-party Plaintiff,**

v.

**Allen ANTAR, Jean Cocchiara, Eddie H. Gindi, Abraham Grinberg, and Kathleen G. Morin, Third-party Defendants.**

No. 87 C 33.

United States District Court, E.D. New York.

Dec. 30, 1988.

---

Rabin & Sirota (Howard B. Sirota, of counsel), New York City, for plaintiff Kaun.

Stull, Stull & Brody (Jules Brody, of counsel), and Joseph H. Weiss, New York City, for plaintiff Bernstein.

Milberg, Weiss, Bershad, Specthrie & Lerach (David J. Bershad, of counsel), New York City, for plaintiff Hoffman.

Abbey & Ellis (Arthur Abbey, of counsel), New York City, for plaintiff Papastamatakis.

Joseph J. Tabacco, Jr., New York City, for plaintiff Lyon.

Akin, Gump, Strauss, Hauer & Feld (David A. Donohue, of counsel), Washington, D.C., Pryor, Cashman, Sherman & Flynn (James A. Janowitz, of counsel), New York City, for defendant and third-party plaintiff Crazy Eddie, Inc.

Kronish, Lieb, Wiener & Hellman (Justin N. Feldman, of counsel), New York City, for defendant Eddie Antar.

Gersten, Savage, Kaplowitz & Zuckerman (Marvin Gersten, of counsel), New York City, for defendants Sam Antar and Mitchell Antar and third-party defendant Allen Antar.

Friedman & Kaplan (Bruce S. Kaplan, of counsel), New York City, for defendants

Eddy Antar, Sam E. Antar, Solomon E. Antar, Isaac Kairey, Edmond Levy, Steven Pasquariello, and Carl G. Zimel and third-party defendant Eddie H. Gindi.

Morrison, Cohen & Singer (Peter H. Morrison, of counsel), New York City, for defendant Panoff.

William H. Saltzman, New Rochelle, N.Y., pro se.

Kelley, Drye & Warren (John P. Marshall, of counsel), New York City, for defendant Scott.

St. John, Oberdorf, Williams, Edington & Curtin (Michael Lampert, of counsel), Newark, N.J., for defendant Pardo.

Shearman & Sterling (Joseph T. McLaughlin, of counsel), New York City, for defendant Peat Marwick Main & Co.

Kaye, Scholer, Fierman, Hayes & Handler (Steven Glassman, of counsel), New York City, for defendant Oppenheimer & Co., Inc.

Weil, Gotshal & Manges (Dennis J. Block, of counsel), New York City, for defendants Salomon Bros., Inc., Bear Stearns & Co., Inc., and Wertheim & Co., Inc.

Shatzkin & Reiss (Howard R. Shatzkin, of counsel), New York City, Eisenberg & Tanchum (David M. Rubin, of counsel), New York City, for third-party defendant Grinberg.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, purchasers of the common stock of defendant Crazy Eddie, Inc. (Crazy Eddie), brought this action against Crazy Eddie and various of its former officers, directors, accountants, and underwriters. The consolidated and amended complaint (the complaint) asserts claims under the Securities Act of 1933 (the Securities Act), 15 U.S.C. § 77a *et seq.* (1982 & Supp. IV 1986), the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78a *et seq.* (1982 & Supp. IV 1986), the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (1982 & Supp. IV 1986), and state law.

The complaint alleges, *inter alia*, that the defendants made or aided and abetted the making of materially false and misleading statements and omissions in connection with three public offerings of Crazy Eddie securities and with the sale of Crazy Eddie securities in general, causing plaintiffs to purchase the securities at a higher price than they would have paid if the truth about Crazy Eddie had been known. Plaintiffs seek to represent themselves and purchasers (except defendants) of Crazy Eddie securities between March 20, 1985 and January 18, 1988 (the Class Period). Various defendants now move to dismiss the complaint for failure to state a claim or for failure to plead fraud with particularity.

Crazy Eddie cross-claimed against defendants Eddie Antar, Sam Antar, Mitchell Antar, Eddy Antar, Sam E. Antar, Solomon E. Antar, David V. Panoff, Isaac Kairey, Steve Pasquariello, William H. Saltzman, James H. Scott, Jr., Edmond Levy, Carl G. Zimel, and David Pardo (the individual defendants), all former officers or directors of Crazy Eddie, for violations of RICO, breach of their fiduciary duties of loyalty and care, and indemnification. Crazy Eddie also cross-claimed against Peat Marwick Main & Co. (Peat Marwick), its former accountant, for breach of contract and of its duty of due care. The cross-claim defendants move to dismiss or stay the cross-claims.

In addition, Crazy Eddie impleaded Allen Antar, Jean Cocchiara, Eddie H. Gindi, Abraham Grinberg, and Kathleen G. Morin, all former employees, for civil conspiracy under RICO and state law and for indemnification. The third-party defendants move to dismiss the third-party complaint and to disqualify Crazy Eddie's counsel.

## I. THE COMPLAINT

For purposes of the motions to dismiss, the court assumes the truth of the facts pleaded.

Crazy Eddie, a corporation founded by Eddie Antar and controlled by the Antar family, first sold shares to the public in September 1984. Between that time and November 1987, although not in all cases

throughout that period, the individual defendants were directors or officers of Crazy Eddie. During that period, defendant Peat Marwick and its predecessor KMG Main Hurdman certified the financial statements that Crazy Eddie filed with the Securities and Exchange Commission (SEC) and disseminated to the public.

Crazy Eddie made three public offerings of securities underwritten by defendants Oppenheimer & Co., Inc., Wertheim & Co., Inc., Bear, Stearns & Co., Inc., and Salomon Brothers, Inc. (the Underwriters), during the Class Period. In March of 1985 and March of 1986, Crazy Eddie offered shares of common stock; in June of 1986, it offered convertible subordinated debentures.

From 1984 through November 1987, defendants fostered the erroneous impression that Crazy Eddie was a rapidly growing firm. The company reported dramatically increasing sales from year to year. The June 1986 prospectus for the offering of convertible subordinated debentures represented that between 1982 and 1986 Crazy Eddie's earnings per share increased from $.05 to $.96, its net sales from $98.2 million to $262.3 million, and its net income from $0.5 million to $13.2 million.

The same prospectus stressed the rapid increase in the number of and sales volume of its retail stores. Crazy Eddie repeatedly emphasized not only its acquisition of new outlets but also the growth of "same store" sales (i.e., sales in stores owned in the previous fiscal year). For example, the Annual Report to Shareholders for the fiscal year ended March 2, 1986 stated that "same store" sales rose 17% over the previous year.

Between October 20, 1986 and October 27, 1987, defendants Eddie Antar, David Panoff, Sam E. Antar, Solomon E. Antar, and Salomon Brothers, Inc., made open market sales of a total of 3,090,900 shares at prices ranging from $18.50 per share on the first date to $2.13 per share at the end of that period. When Eddie Antar made the largest single sale of 1,500,000 shares on November 10, 1986, Crazy Eddie issued a press release stating that he sold the shares solely in anticipation of a rise in the federal capital gains tax.

On December 23, 1986, Eddie Antar unexpectedly resigned as President of Crazy Eddie. Although the company's announcement stated that he would remain as Chairman of the Board and Chief Executive Officer, he resigned as Chief Executive Officer for unspecified "personal reasons" only 17 days later, on January 9, 1987. Rumors circulated in the financial press that he was seriously ill. Rather than dispel these rumors, defendants "permitted the marketplace to perceive that Crazy Eddie had been abandoned by Antar," exacerbating a decline in the price of Crazy Eddie securities.

On January 6, 1987, three days before Antar's resignation, Crazy Eddie announced that its "same store" sales decreased 9% during December 1986. In contrast, its competitors' "same store" sales increased 11% to 25%. Having declined to $11.50 per share by December 31, 1986, after Antar's resignation as President, the price of Crazy Eddie's stock now plummeted to $8.00 per share.

On April 10, 1987, as business continued to deteriorate, Crazy Eddie adopted a "poison pill" to repulse hostile takeover attempts. Nonetheless, a dissident shareholder, Entertainment Marketing, Inc., waged a successful proxy fight to wrest control of the company from the Antar family. On November 6, 1987, the shareholders elected an entirely new Board of Directors and dismissed virtually every former officer.

In November 1987, Crazy Eddie announced that a physical inventory taken at the direction of new management had revealed an estimated inventory shortfall of $45 million. On January 19, 1988, the company announced that it was writing off $65 million from inventory. Its net worth, reported at $93 million on March 1, 1987, was now only $7 million.

The difference between the rosy picture of Crazy Eddie's fortunes painted by defendants and the bleak truth uncovered by new management is due to various fraudulent practices of the individual defendants.

They inflated Crazy Eddie's net income, inventory figures, and per store sales figures through a series of improper financial reporting practices. For example, they treated wholesale transactions as retail sales, creating the impression that per store sales were materially higher than they actually were. They treated as inventory merchandise that Crazy Eddie intended to return to manufacturers, nicknaming this merchandise "reeps." Transactions that were really consignments they treated as sales. In pursuit of these schemes, they altered and destroyed documents, including invoices, inventory count sheets, debit memos, sales-incentive-related materials, and accounting records. They conducted a mass shredding of corporate documents days or weeks before Entertainment Marketing, Inc., assumed control on November 6, 1987.

In addition, the Antars sold approximately five to ten million dollars' worth of inventory to themselves and other family members in unrecorded cash transactions for eventual resale to others. The Antars termed these sales "nehkdi," an Arabic slang word for under-the-table transactions. One of the motives for inflation of Crazy Eddie's inventory was to offset and conceal the "nehkdi" sales.

Peat Marwick violated several generally accepted auditing standards and accounting principles described in the complaint in failing to look behind Crazy Eddie's irregular books and fabricated records and its patently false explanations for the "loss" of destroyed records.

The Underwriters failed to conduct a reasonably diligent inquiry into the business and operations of Crazy Eddie and participated in and aided and abetted the unlawful acts and practices of Crazy Eddie and the individual defendants.

The complaint brings claims under sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, alleging that the registration statements issued pursuant to the public offerings in 1985 and 1986 contained material misstatements and omissions; under sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(2), 77o, alleging that

defendants are primarily and secondarily liable to plaintiffs for materially misleading misstatements and omissions in the prospectuses; under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5 of Rules of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1987), alleging that defendants employed devices, schemes, and artifices to defraud and made material misstatements and omissions falsely assuring investors of Crazy Eddie's strong financial condition and promising financial performance; under section 1962 of RICO, 18 U.S. C. § 1962, alleging that defendants (a) invested income derived from a pattern of racketeering activity in an enterprise engaged in interstate commerce, (b) acquired or maintained control of an enterprise through a pattern of racketeering activity, (c) participated in the conduct of an interstate enterprise's affairs through a pattern of racketeering activity, and (d) conspired to violate subsections (a)—(c) of section 1962; and for common law fraud and negligent misrepresentation.

## II. THE MOTIONS TO DISMISS THE COMPLAINT

Most of the individual defendants—Eddie Antar, Eddy Antar, Sam E. Antar, Solomon E. Antar, Isaac Kairey, Steve Pasquariello, Edmond Levy, and Carl G. Zimel—and Peat Marwick move to dismiss the complaint.

### A. The Securities Act Claims

Defendants move to dismiss the claims brought under sections 11, 12(2), and 15 of the Securities Act on various grounds.

Count One of the complaint asserts claims against all defendants except David Pardo for violations of sections 11 and 15 of the Securities Act. Section 11 provides in pertinent part that if any part of a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading," any person acquiring such security may sue every person who (1) signed the registration statement, (2) was a director of the issuer when

it was filed, (3) was an accountant named as having certified any part of the statement as to which suit is brought, or (4) was an underwriter. 15 U.S.C. § 77k.

Section 15 makes those who control, through stock ownership, agency, or otherwise, persons that have violated sections 11 or 12 of the Securities Act jointly and severally liable with the controlled persons.

Count Two of the complaint alleges claims against all defendants except David Pardo for violations of sections 12(2) and 15 of the Securities Act.

Section 12(2) provides, so far as relevant, that any person who offers or sells a security "by means of a prospectus" that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading" shall be "liable to the person purchasing such security from him." 15 U.S.C. § 77l (2).

#### 1. The Tracing Requirement

Defendants' first ground for dismissal of these claims is that plaintiffs have no standing to bring claims under sections 11 and 12(2) because they do not plead that they purchased stock issued pursuant to the allegedly misleading prospectuses and registration statements. Moreover, they do not plead at all that they purchased convertible debentures, which were offered in June 1986.

Plaintiffs respond that the so-called tracing requirement—the requirement that plaintiffs prove their shares were issued pursuant to the disclosures in question—is a question of fact reserved for trial. Crazy Eddie had only made four public offerings of securities by the end of the Class Period, and three of them are at issue in this case. In plaintiffs' view, it is more than likely that at least some of their securities originate with the two 1985 and 1986 stock offerings.

■ To state a claim under section 11, plaintiffs must plead that their stock was issued pursuant to the public offerings alleged to be defective. *Ackerman v. Clini-*

*cal Data, Inc.,* [1985–1986 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,207 at 91,568 (S.D.N.Y.1985) [1985 WL 1884] (quoting *Lorber v. Beebe,* 407 F.Supp. 279, 286 (S.D.N.Y.1975)); *see Barnes v. Osofsky,* 373 F.2d 269, 271–73 (2d Cir.1967); *In re LILCO Sec. Litig.,* 111 F.R.D. 663, 671 (E.D.N.Y.1986). To state a claim under section 12(2), they must plead that their shares were issued pursuant to the defective prospectus. *Ackerman, supra,* at 91,-568; *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 277–78 (S.D.N.Y.1984).

■ Although there was only one public offering prior to the Class Period, that offering involved 2,000,000 shares; 3,790,-000 shares are attributable to the March 1985 and March 1986 public offerings, and several millions more to sales by the Antars and other defendants. On this pleading it is by no means certain that any of the stock purchased by plaintiffs is traceable to the public offerings during the Class Period. Plaintiffs need not, of course, prove that their shares are traceable to the 1985–86 offerings at this early stage of the litigation. But they must allege it. That they have failed to do, and therefore they have failed to state a claim under sections 11 and 12(2) relating to the offerings of common stock.

■ Since none of the plaintiffs purchased convertible debentures during the Class Period, they clearly have no standing under sections 11 and 12(2) to challenge the June 1986 debenture offering. Courts have allowed shareholders who have a valid claim in their own behalf to represent holders of other kinds of securities in class actions under Rule 10b–5. *See, e.g., Green v. Wolf,* 406 F.2d 291 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). But this is not a motion for class certification. The question here is whether plaintiffs have stated a claim in their own behalf under sections 11 and 12(2). Not having purchased the debentures issued in the June 1986 offering, they are precluded from bringing a section 11 or 12(2) suit on the basis of that offering.

For the foregoing reasons the motion to dismiss the section 11 and 12(2) claims will be granted, with leave to amend the complaint. Nonetheless, the court will consider defendants' remaining arguments on the assumption that plaintiffs will choose to amend their complaint so as to plead facts showing that their securities are traceable to the 1985–86 stock offerings.

### 2. *Failure to Identify the Alleged Misrepresentations*

Defendants' second argument is that plaintiffs have failed to identify any material misstatements in the registration statements and prospectuses challenged under sections 11 and 12(2). Peat Marwick adds that plaintiffs have failed to identify those alleged misstatements that it prepared or certified.

 Section 11 gives purchasers of registered securities a cause of action against those who play a direct role in a registered offering for harm caused by material misstatements and omissions in the registration statement. *E.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). Although issuers are liable for the entire contents of the registration statement, even innocent misstatements, accountants are liable "only for those matters which purport to have been prepared or certified by them." *Id.* n. 11; *see* 15 U.S.C. § 77k(a)(4).

 Section 11 violations need not be pleaded, however, with the particularity required of fraud claims governed by Federal Rule of Civil Procedure 9(b), which requires that "averments of fraud or mistake" be stated "with particularity." *E.g., In re Lilco Sec. Litig.,* 625 F.Supp. 1500, 1502–03 (E.D.N.Y.1986); *Schoenfeld v. Giant Stores Corp.,* 62 F.R.D. 348, 350–51 (S.D.N.Y.1974). Plaintiffs have not identified particular allegedly false sentences and words in the registration statements. But section 11 does not require them to do so. Plaintiffs need only comply with Rule 8(a) of the Federal Rules of Civil Procedure by setting forth "a short and plain statement of the claim."

 The complaint paints a detailed picture of inflated sales figures and inventory counts and other irregular accounting practices used by defendants to disguise the "nehkdi" and "reep" transactions. The clear implication is that the financial statements and projections in the registration statements, including those certified by Peat Marwick, were false and misleading in that they gave an unduly optimistic impression of Crazy Eddie's financial health. *See Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 664 (S.D.N.Y.1987); *cf. Isquith v. Middle S. Utils., Inc.,* 847 F.2d 186, 207, 211 (5th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (test for determining adequacy of disclosure is whether disclosure is materially false and misleading as a whole). The pleadings put defendants on notice of what they are alleged to have done. They are therefore sufficient under section 11.

The section 12(2) claim is inadequate against the moving defendants for the reasons discussed below. It is, however, pleaded with adequate specificity for the same reasons as pertain to the section 11 claims and the section 10(b) claims discussed below.

### 3. *The Statute of Limitations*

Defendants' third argument in support of their motion to dismiss is that the section 11 and 12(2) claims are barred by the one-year statute of limitations.

 Section 13 of the Securities Act bars section 11 and 12(2) claims

> unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence....

15 U.S.C. § 77m (1982). A plaintiff suing under sections 11 and 12(2) must allege compliance with section 13 as part of its claim. *E.g., Quantum Overseas, supra,* at 662. The complaint must set forth:

> (1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has

elapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

*Id.* (quoting *Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, 914 (S.D.N.Y.1986), *vacated in part,* 110 F.R.D. 693 (S.D.N.Y. 1986)).

■ The complaint alleges that plaintiffs did not discover and, "due to defendants' concealment of [the] facts," could not reasonably have discovered before November 1987 that statements in the registration statements and prospectuses were fraudulent because that was the date when new management assumed control of Crazy Eddie and began to reveal the company's true financial condition.

The first complaint in this now-consolidated action was filed on January 7, 1987, alleging violations of section 10(b) of the Exchange Act and Rule 10b–5. The amended complaint now under consideration, the first to bring claims under the Securities Act, was filed on March 9, 1988, after plaintiffs had entered into a Memorandum of Understanding (the Understanding) with Crazy Eddie to prosecute jointly claims against former management.

Plaintiffs have adequately alleged the time and circumstances of their discovery of the misstatements (upon the entry of new management in November 1987) and why they could not reasonably have discovered them within one year (because defendants concealed the truth).

■ They do not allege having undertaken any diligent efforts to make or seek such discovery. But that requirement is not significant where, as here, the complaint alleges that the issuer's management engaged in an on-going fraud to conceal from the public the company's true financial condition. If plaintiffs had no reason to suspect that anything was amiss, they had no reason to undertake efforts to find out the truth. That is precisely the situation in which plaintiffs allege to have found themselves.

The court will not hold plaintiffs, who are individual investors, to a higher burden of investigation than that naturally assumed by Entertainment Marketing, Inc., which had every incentive to find out as much as possible about Crazy Eddie and the misdeeds of the individual defendants. That company was unable to make a thorough investigation until it ousted the individual defendants.

Plaintiffs' Securities Act claims are not barred by the statute of limitations.

### 4. *Liability of Non–Director Individual Defendants Under Section 11*

■ Defendants' fourth argument, advanced by Kairey, Pasquariello, Sam E. Antar, Solomon E. Antar, and Levy, is that those individual defendants cannot be held liable under section 11 because they were not directors at the time of the 1985–86 offerings and did not sign the registration statements. Plaintiffs respond that they seek to hold those defendants liable as "control persons" under section 15 of the Securities Act.

The complaint alleges that "each of the defendants (except David Pardo) signed one or more of the Registration Statements ..., or was a director of Crazy Eddie at the time of the filing...." Yet it elsewhere indicates that those five defendants were not directors at the time of the filings, and the registration statements themselves show that those defendants did not sign them. Edmond Levy is not mentioned by name in the complaint at all, but only in the caption.

The complaint alleges no facts showing that these defendants exercised control over any person liable under sections 11 or 12, except that some of them were related to directors. The section 11 and 12(2) claims will therefore be dismissed as to them, with leave to amend. Edmond Levy not having been mentioned in the complaint at all, all claims will be dismissed as to him, with leave to amend.

### 5. *Liability Under Section 12(2)*

Defendants' fifth argument is that the complaint fails to state a claim under section 12(2) because the moving defendants are not "offerors" or "sellers" of the securities liable to the persons purchasing

"from" them, citing *Pinter v. Dahl,* —— U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

The *Pinter* case concerned claims brought under section 12(1) of the Securities Act. That section provides that any person who "offers or sells" an unregistered security in violation of section 5, 15 U.S.C. § 77e, shall be liable "to the person purchasing such security from him."

The Court held that a person who "offers or sells" a security is liable to the purchaser only if he passed title to the purchaser, offered to sell the security, solicited the sale (motivated at least in part by a desire to serve his own or the owner's interest), or was an aider and abettor or controlling person of such a person. —— U.S. ——, 108 S.Ct. at 2076–82.

The Supreme Court expressly declined to decide whether the same reasoning applies to the identical language of section 12(2). *Pinter, supra,* —— U.S. —— n. 20, 108 S.Ct. 2076 n. 20. However, the Second Circuit has extended the rule of the *Pinter* case to section 12(2). *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988) (citing *Schillner v. H. Vaughan Clarke & Co.,* 134 F.2d 875 (2d Cir.1943) (definition of seller is identical under sections 12(1) and 12(2))).

 Defendants thus may be found liable for violations of section 12(2) only if they actually passed title to plaintiffs, offered to sell the securities, solicited the sale, or were control persons or aiders and abettors. *See Pinter, supra,* —— U.S. ——, 108 S.Ct. 2080. Under the *Pinter* and *Capri* cases, substantial participation in causing the sales to take place, even if accompanied by scienter, is insufficient to bring a defendant within the ambit of section 12(2). *Id.,* —— U.S. ——, 108 S.Ct. 2079–82.

Except insofar as the individual defendants and Peat Marwick may be liable as aiders and abettors or control persons, the complaint fails to state a claim under section 12(2) against them. The complaint contains no allegation that they sold or offered to sell the securities in question to plaintiffs or solicited any sales. Plaintiff

may have leave to amend to make such an allegation if the facts justify it.

The sufficiency of the complaint with respect to aider and abettor and control person liability under sections 12(2) and 15 will be discussed below together with analogous claims brought under section 10(b) of the Exchange Act.

B. *The Fraud Claims*

Count Three of the complaint alleges that defendants misrepresented the financial condition of Crazy Eddie in violation of section 10(b) of the Exchange Act and Rule 10b–5.

Section 10(b), the primary antifraud provision of the Exchange Act, provides in pertinent part that it is unlawful for any person to "use or employ" a "manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b).

Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b–5, which provides so far as relevant that it is unlawful "for any person, directly and indirectly," "in connection with the purchase or sale of any security,"

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5 (1987).

Defendants move to dismiss the section 10(b) claims, as well as the claims brought under sections 12(2) and 15 of the Securities Act, for failure to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. They also assert assorted other grounds for this motion.

### 1. *The Particularity Requirement and the Section 10(b) Claims*

As noted above, Rule 9(b) provides that "in all averments of fraud ... the circumstances constituting the fraud ... shall be stated with particularity." The purposes of the rule are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *E.g., DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Rule 9(b) applies to claims of fraud brought under section 10(b) of the Exchange Act. *See, e.g., Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971).

The requirements of Rule 9(b) must, however, be reconciled with those of Rule 8, which calls for a "short and plain statement" of plaintiff's claims for relief, Fed.R.Civ.P. 8(a), with "simple, concise, and direct" averments, Fed.R.Civ.P. 8(e). *Denny v. Barber,* 576 F.2d 465, 467 (2d Cir.1978). The pleading need only be sufficiently particular to serve the three policies of Rule 9(b) enumerated above. Plaintiffs need not plead their evidence, so long as they give defendants notice of what they are charged with. *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

The nature and extent of the detail required by Rule 9(b) vary with the circumstances of each case. *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 393 (S.D. N.Y.1988). In general, "defendants must be apprised of the nature of the allegedly false statements, by whom they were made and when, in what manner the statements were false, how they misled plaintiff, and what defendants obtained as a result of the alleged fraud." *Id.* Where scienter is an element of the cause of action, plaintiffs must specifically plead facts giving rise to a strong inference that defendants had knowledge of the facts or recklessly disregarded their existence. *E.g., Connecti-cut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987).

Defendants argue that plaintiffs have failed to satisfy these standards in several respects. They contend that the complaint does not allege the precise content of any misstatements or omissions, the time and place of their making, the manner in which they misled plaintiffs, and what defendants obtained as a result of the fraud.

The complaint satisfies these basic "what, when, where, how, and why" requirements of Rule 9(b). The allegations supply as much detail of the alleged fraud as can be expected before discovery in a case where defendants are alleged to have willfully concealed and destroyed evidence of their wrongdoings.

The complaint alleges, for example, that defendants falsely represented same store sales in the 1985 and 1986 Annual Reports to Shareholders, in press releases of September 1985, December 4, 1985, January 7, 1986, and September 5, 1986, in interim reports to shareholders, and in Form 10–Q filings for all quarters from the spring of 1985 until November 10, 1986, thereby satisfying the time, place, and content requirements of the rule.

Although the complaint does not state precisely how great defendants' inflation of same store sales was, it is unlikely that plaintiffs could provide such details without conducting discovery. *See Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987) ("the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts"). To the extent that cases cited by defendants, such as *Goldberg v. Shapiro,* [1974 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,813 at 96,717 (S.D.N.Y. 1974) [1974 WL 451] hold otherwise, the court respectfully declines to follow those holdings.

The complaint makes clear the manner in which plaintiffs were misled. Plaintiffs claim that they relied on the above representations and on the integrity of the mar-

ket in purchasing Crazy Eddie stock, and consequently paid more for their shares than they were worth.

The pleading also details at some length what the individual defendants obtained from the fraud. They are alleged to have milked money from the corporation through the "nehkdi" transactions while maintaining stock prices at an inflated level, enabling some of them to profit from sales of substantial blocks of stock.

As to Peat Marwick, the allegations are less incriminating. But it is fair to infer that, at a minimum, Peat Marwick gained from its alleged role in the preparation of the misleading statements the continued patronage and goodwill of its client.

■ Defendants also fault plaintiffs for pleading the entire complaint, except for their purchase of stock, on information and belief. Pleadings of fraud cannot be based upon information and belief unless the required facts are peculiarly within the opposing party's knowledge. *E.g., DiVittorio, supra,* at 1247. Even where permissible, allegations on information and belief must be accompanied by a statement of the facts upon which the belief is based. *Id.*

■ This case represents a classic instance of the facts necessary to support the claim being "peculiarly within the opposing party's knowledge." Plaintiffs can hardly allege defendants' fraudulent acts upon knowledge before they have taken the individual defendants' depositions and conducted discovery. The detailed descriptions in the 46–page complaint of the "nehkdi" and "reep" transactions, the destruction of documents, the insider sales, new management's discovery and write-off of a $65 million shortfall in inventory, and the plummeting of Crazy Eddie's net worth, the latter three allegations being matters of public record, are sufficient at this stage of the litigation to support the inference that plaintiffs draw from them.

■ Defendants further attack the complaint for failing to specify the role played by each defendant in the alleged misstatements and omissions. The representations at issue—in registration statements, annual reports, SEC filings, and the like—"may be presumed to entail the collective action of the directors, officers, and the accountant," and the complaint need not particularize the role played by each of them. *Quantum Overseas, supra,* at 667–68 (quoting *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y. 1983)); *see DiVittorio, supra,* at 1248; *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir. 1986); *see also Kolin v. American Plan Corp.,* [1984–1985 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 92,051 at 91,240 (E.D.N.Y.1985) [1985 WL 6422] (allegation that accountant "knew or should have known" that financial statements were false sufficient to plead scienter).

Such a presumption is particularly appropriate where the complaint alleges specific actions by the insiders in furtherance of the fraud—though not identifying the exact role of each—that strongly suggest knowledge of the false sales and inventory counts reported in Crazy Eddie's public filings. These actions include the development of a data management system described in Crazy Eddie's June 1986 prospectus whereby the directors and officers could closely monitor sales results, giving rise to a fair inference that the individual defendants knew what the true sales and inventory figures were; the falsifying, doctoring, and shredding of documents, particularly just before new management assumed control; and the "nehkdi" sales to themselves.

■ In addition, defendants claim that the complaint does not adequately allege scienter on the part of each defendant. Rule 9(b) permits averments of mental state to be pleaded generally, although a plaintiff must establish a factual basis from which to infer scienter. *E.g., Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1004 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). Defendants interpret this requirement to mean that the complaint must plead facts particular to each defendant from which that defendant's scienter can be inferred. They claim that this requirement exists independently of the need discussed above for the

complaint to particularize the role played by each defendant. The latter requirement serves, in their view, only to establish time, place, and content, not scienter.

Defendants' interpretation is inconsistent with the holdings that the individual roles played by insiders and accountants need not be alleged with particularity. The facts upon which an inference of scienter particular to each defendant is likely to depend are the same facts describing that person's role in the fraud. The fact that the moving defendants are insiders or the corporate defendant's accountant is the very fact giving rise both to the inference of involvement in the fraud and to the inference of scienter. Again, the specific allegations of acts by the individual defendants showing both participation and knowledge bolster the inference of scienter.

In sum, the complaint gives the individual defendants sufficient notice of the claims brought against them and contains enough specificity to dispel concern that it is a "strike suit" or will unjustifiably damage defendants' reputation or goodwill. It therefore fulfills the basic purposes of Rule 9(b). *See Goldman, supra,* at 1070.

### 2. *Aider and Abettor Liability*

Defendants assert that plaintiffs also fail to meet the particularity requirement of Rule 9(b) with respect to the aider and abettor claims.

■ The court has found that the complaint is pleaded with sufficient particularity to make out primary violations by the moving defendants of section 10(b) of the Exchange Act. It follows that the complaint adequately pleads aiding and abetting under that section. The court will therefore consider their secondary liability under section 12(2) of the Securities Act.

■ In this circuit, aiding and abetting liability under the securities laws requires (1) a securities violation by a primary wrongdoer, (2) knowledge of the wrongdoing, and (3) substantial assistance in the primary wrongdoing. *E.g., Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). As with other claims sounding

in fraud, the conduct constituting the fraud must be alleged with particularity. *Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246, 1284 n. 4 (S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 822 F.2d 246 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

■ Crazy Eddie is a "seller" under section 12(2) and thus may be held primarily liable for violations of that section. The complaint does not specify the statements in the March 1985 and March 1986 prospectuses that plaintiffs allege to be false and misleading (statements from the June 1986 prospectus are not relevant, since plaintiffs have no standing to challenge that offering). But the complaint mentions that Crazy Eddie's "net income, inventory figures, and per store sales figures" were materially inflated during the Class Period. This allegation is sufficient to put defendants on notice of the particular statements that plaintiffs wish to prove false or misleading. The complaint therefore properly alleges a primary violation.

■ For the reasons discussed with respect to primary liability under section 10(b) above, the complaint adequately alleges the moving defendants' knowledge of the wrong. Recklessness is sufficient to establish scienter where the defendant owes a duty to the victims of the fraud, as do the individual defendants, or where the defendant is an accountant, as was Peat Marwick, upon whose audit or opinion letter plaintiffs reasonably and foreseeably relied. *See Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed. 2d 698 (1978). "One charged with the specific responsibility of a competent professional audit cannot relieve himself of liability by shutting his eyes to what was plainly to be seen." *Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271, 273 (S.D. N.Y.1987), and cases cited.

■ The complaint also alleges substantial assistance in the fraud on the part of the moving defendants. The individual defendants may be presumed to have lent substantial assistance by virtue of their

status as insiders; without them, Crazy Eddie was powerless to act. Sorting out exactly who did what must await the proofs at trial. Peat Marwick prepared financial statements that allegedly contained misrepresentations, and without those financial statements Crazy Eddie could not have offered the securities. This activity constitutes substantial assistance. *Rolf, supra,* at 48.

The complaint thus adequately pleads the three elements of aider and abettor liability under section 12(2).

### 3. *Control Person Liability*

Defendants argue that the complaint fails to state a claim for "control person" liability under section 15 of the Securities Act, 15 U.S.C. § 77*o*, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

As noted above, section 15 provides in pertinent part that persons who control a person liable under sections 11 or 12 are jointly and severally liable with the controlled person. Section 20(a) is similar, providing that any person who controls a person liable under any section of the Exchange Act is jointly and severally liable with the controlled person.

■ The purpose of these sections is "to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973). As with the aiding and abetting doctrine, plaintiffs must plead a primary violation of the securities laws and knowledge of the wrong. In addition, they must plead that the defendant had "the power to exercise control over the primary violator, based on a special relationship such as agency or stock ownership." *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y. 1985).

■ The complaint clearly alleges that Eddie Antar is a control person. It states that he set all policy for Crazy Eddie, made the most important decisions for the Company, "signed filings with the SEC or reviewed and approved reports to shareholders and Company press releases, ... installed his family and friends as the Company's other officers and directors [and] ... dominated and controlled Crazy Eddie at all relevant times." These allegations, together with Antar's status as founder, Chief Executive Officer, President, and Chairman of the Board of Crazy Eddie through much of the Class Period and his ownership of several million shares of stock, are unquestionably sufficient to state a claim against him for control person liability.

■ At the same time, however, these sweeping allegations preclude the possibility that any of the other defendants exercised control over Crazy Eddie within the meaning of sections 15 or 20(a). The complaint does not give any indication that Eddie Antar shared his dominion with other officers and directors, let alone more remote parties such as Peat Marwick. "A person's status as an officer, director or shareholder, absent more, is not enough" to show that he controlled the corporation. *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988). The complaint therefore fails to state a claim for control person liability as to any of the moving defendants except Eddie Antar.

### 4. *Failure to Allege Injury*

Defendants claim that the complaint is insufficient under section 10(b) because plaintiffs fail to allege that they sold their shares at a loss attributable to the alleged misstatements.

■ To allege injury under section 10(b), plaintiffs must plead both "transaction causation"—that the alleged misstatements caused them to purchase Crazy Eddie securities—and "loss causation"—that they suffered economic loss as a result. *E.g., Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 20 (2d Cir.1986), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust Co.,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Defendants contend that plaintiffs can only allege "loss

causation" by claiming to have sold their shares at a loss.

■ The economic losses cognizable under section 10(b) are not limited to the type of out-of-pocket loss envisioned by defendants. The complaint alleges that defendants made materially misleading statements and omissions that caused the price of Crazy Eddie stock to be higher than its true value. Consequently, plaintiffs paid more for the stock than it was worth. Their injury is the difference between the price paid and the true value of the stock when bought. *See, e.g., In re Washington Pub. Power Supply Sys.*, 650 F.Supp. 1346, 1354 (W.D.Wash.1986), *aff'd*, 823 F.2d 1349 (9th Cir.1987) (plaintiff can recover "the amount paid over the true value.... [T]he injury occurs at the time of purchase").

*Packer v. Yampol*, 630 F.Supp. 1237 (S.D.N.Y.1986), cited by defendants, is not to the contrary. In that case plaintiffs alleged not only that misrepresentations had inflated the price of the securities they purchased, but that the misrepresentations continued through the date of the pleading. Plaintiffs were thus free to sell their securities at an inflated price and "bail out" of the company unscathed. In this case, plaintiffs allege that the truth has already come to light, making the inflated prices they paid a thing of the past. That allegation is sufficient to establish a section 10(b) injury.

Not only is it unnecessary to allege a loss on sale, it is generally irrelevant to section 10(b) claims. Plaintiffs' eventual realization of a profit or loss upon sale of the shares may result from supervening market forces (e.g., a general stock market rise or crash) that have nothing to do with the misrepresentations that induced the purchase and caused the inflated price. *In re Washington Pub. Power Supply Sys.*, *supra*, at 1353.

### 5. *The Insider Trading Claim*

Defendants argue that the complaint, if it alleges insider trading under section 10(b), is deficient with respect to that claim.

■ Although the complaint discusses stock sales by Eddie, Sam E., and Solomon E. Antar and David Panoff, that allegation seems intended not to plead insider trading but to establish scienter with respect to the misrepresentation claims. If plaintiffs mean, however, to allege insider trading, their pleadings are inadequate. Plaintiffs do not allege contemporaneous trading with the trading defendants. *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94–95 (2d Cir.1981); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir.1974). Their claims obviously have no application to the other defendants.

The court will assume that no insider trading claim is alleged. If plaintiffs mean to allege insider trading, they may amend the complaint.

### 6. *The Statute of Limitations Under Section 10(b)*

Defendants argue that the section 10(b) claims are time-barred.

■ Section 10(b) does not have an express statute of limitations. The Second Circuit has traditionally applied the limitations period for common-law fraud embodied in N.Y.C.P.L.R. §§ 203(f), 213(8) (McKinney's 1972 & Supp.1988) to section 10(b) claims. *E.g., Armstrong, supra*, at 86–87. Under those provisions, plaintiffs must bring suit within six years of accrual of the cause of action or two years of discovery of the fraud, whichever is later. Plaintiffs easily meet that standard.

Defendants contend, however, that the Second Circuit will follow the Third Circuit in adopting a shorter limitations period. *See In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.1987). The Third Circuit relied on *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), and *DelCostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Those cases held that when a federal statute has no express limitations period, courts should borrow an analogous federal statute of limitations, rather than a state statute, if the federal limitations period clearly pro-

vides a closer analogy than available state statutes and better promotes the federal policies at stake, such as a need for uniformity. *Agency Holding Corp., supra,* 483 U.S. at ——, 107 S.Ct. at 2763; *DelCostello, supra,* 462 U.S. at 171–72, 103 S.Ct. at 2294. Applying that analysis to section 10(b), the Third Circuit held that statutes of limitations covering other sections of the Exchange Act, rather than state limitations periods, should govern actions under that section. The court borrowed from sections 9(e), 16(b), 18(c), and 29(b), 15 U.S.C. §§ 78i(e), 78p(b), 78r(c), 78cc(b), to create a limitations period for section 10(b) of "one year after the plaintiff discovers the facts constituting the violation." *In re Data Access Sys. Sec. Litig., supra,* at 1545.

This court finds the Third Circuit's reasoning sound and believes it highly likely that the Second Circuit will follow suit. Nonetheless, for the reasons discussed regarding the limitations period under the Securities Act above, plaintiffs' claim is timely.

## C. *The RICO Claims*

Count Four of the complaint asserts claims against the individual defendants under section 1962 of RICO. This count alleges four separate claims, one for each subsection of section 1962. The first is brought under section 1962(a), alleging the investment of income "derived from a pattern of racketeering activity" in an "enterprise." The second, brought under section 1962(b), alleges the use of a pattern of racketeering activity to acquire or maintain an interest in an enterprise. The third is brought under section 1962(c), alleging the conduct of the affairs of an enterprise "through a pattern of racketeering activity." The fourth, brought under section 1962(d), alleges a conspiracy to violate subsections (a)-(c).

Under the statute, a "pattern of racketeering activity" "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5), commonly referred to as "predicate acts." Here the predicate acts are the securities frauds alleged elsewhere in the complaint, mail and wire fraud, and con-

sumer frauds. The alleged "enterprise" is Crazy Eddie.

The count is clearly inadequate as to § 1962(a). The allegations say that the individual defendants took money out of the enterprise, not invested money in it. The claim under § 1962(b) is likewise deficient. It nowhere suggests that defendants' profits from their supposed pattern of racketeering activity were used to acquire control of Crazy Eddie; rather, they are alleged to have taken the money and run.

Although the claims under subsections 1962(c) and (d) are less patently deficient, they too are defective in ways that cannot be corrected by more particularized pleading. In *Beauford v. Helmsley,* 843 F.2d 103 (2d Cir.1988), the Second Circuit addressed "whether a discrete, even if widespread, and a continuing even if finite, scheme is sufficient to permit a plaintiff to take advantage of RICO" and concluded that it was not. *Id.* at 110.

The scheme alleged in this case, like that in the *Beauford* case, is "discrete" —it is limited to frauds on securities holders and consumers perpetrated through Crazy Eddie. And although less obviously "finite" than the scheme in *Beauford,* which involved the sale of a fixed number of apartments, the scheme described by the complaint involved the divestiture of Crazy Eddie stock at inflated prices contemporaneously with waste of the company's assets —not a plan that could have been expected to continue indefinitely.

There is no allegation that any of defendants' acts or profits were to be extended to or invested in other enterprises or in any way to continue after they looted Crazy Eddie.

As this court recently discussed in *La Delite, Ltd. v. Chipwich, Inc.,* 691 F.Supp. 613 (E.D.N.Y.1988), Congress's initial objective in enacting civil remedies under RICO was to bring to "'bear on the infiltration of organized crime into legitimate business or other organizations the full panoply of civil remedies.'" *Id.* at 616 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 76, 81 (1969)). As in the *LaDelite*

case and those discussed therein, the individual defendants in this case are "hardly people dedicated to a life of crime, although they may have committed acts of fraud." *Id.* at 618. Their actions are not of the sort that Congress sought to prevent through civil RICO remedies.

The RICO count of the complaint is dismissed with prejudice.

### D. *The Common Law Claims*

Count Five of the complaint alleges claims against all defendants for common law fraud. Count Six sets forth claims against all defendants except Peat Marwick for negligent misrepresentation.

Defendants argue that plaintiffs fail to state a claim for common law fraud because they have failed to plead with specificity or to allege injury from the fraud. The court has rejected those arguments in discussing the adequacy of the section 10(b) allegations above.

Defendants contend that plaintiffs' claim for negligent misrepresentation fails under New York law because they did not owe a duty to plaintiffs. Plaintiffs counter that (1) defendants owed them a duty because it was foreseeable that they would rely on the alleged misrepresentations; and (2) even if defendants did not owe them a duty under New York law, New Jersey law may apply because Crazy Eddie moved its headquarters to New Jersey during the class period.

■ Under New York law, plaintiffs may not sue for negligent misrepresentation unless they are in some kind of privity or similar relationship with defendants. Foreseeable reliance on the misrepresentations is not enough. *E.g., Credit Alliance v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551–53, 493 N.Y.S.2d 435, 443–44, 483 N.E. 2d 110, 118 (1985); *White v. Guarente,* 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 477, 372 N.E.2d 315, 318 (1977); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 189, 174 N.E. 441, 448 (1931).

■ Under New Jersey law, however, plaintiffs may recover for negligent misrepresentation if they are "foreseeable users" of the statements and rely upon them for some legitimate business purpose. *See, e.g., Rosenblum v. Adler,* 93 N.J. 324, 461 A.2d 138, 152–53 (1983) (accountant held liable to "all those whom that auditor should reasonably forsee as recipients from the [audited] company of the statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes").

It thus appears that the complaint states a cause of action under New Jersey law and not under New York law. *See Credit Alliance, supra,* 65 N.Y.2d at 553 n. 11, 493 N.Y.S.2d at 444 n. 11, 483 N.E.2d at 119 n. 11 (contrasting law in New York with that in New Jersey). Since the parties have not briefed the choice of law issue, the court will not grant the motion to dismiss the negligent misrepresentation count at this time.

### III. THE MOTION TO DISMISS OR STAY THE CROSS–CLAIMS

Crazy Eddie has cross-claimed against the individual defendants for breach of their fiduciary duties of loyalty and care, for neglect and mismanagement, for RICO violations, and for indemnification, and against Peat Marwick for breach of contract and breach of its duty of due care. The allegations in the cross-complaint are similar to those in the complaint, offering more detail obtained from corporate records and internal investigations.

The cross-claim defendants move to dismiss Crazy Eddie's cross-claims for lack of subject matter jurisdiction and failure to state a claim. In the alternative, they move to stay the cross-claims until decision on the motions to dismiss the complaint and to certify a class.

Cross-claim defendants first argue that the cross-claims are not truly cross-claims because Crazy Eddie is really a plaintiff. They urge that the court cannot consider those claims because there exists no independent basis for federal jurisdiction over them.

This argument is premised on the Understanding that Crazy Eddie entered into

with plaintiffs settling the claims brought by the original plaintiffs, Bernstein and Kaun, and agreeing to prosecute claims against the individual defendants jointly. The moving defendants contend that, at least for the purposes of the cross-claims, the court should realign Crazy Eddie as a plaintiff where its real interest lies.

Cross-claim defendants' argument is either moot or premature. Plaintiffs' counsel informed the court by letter on December 16, 1988 that plaintiffs have rescinded the Understanding. There is therefore no existing settlement or agreement. If some such arrangement is made in the future, cross-claim defendants may renew their motion.

Cross-claim defendants next assert that the court has no jurisdiction over the cross-claims. They argue that the RICO count is fatally defective and the remaining counts are too remote from the claims brought in the complaint to come within the court's ancillary jurisdiction.

The court finds the RICO count, brought under 18 U.S.C. § 1962(a)–(d), deficient for the reasons discussed in disposing of the RICO count in the complaint. The fraudulent acts alleged do not constitute "continuing" or "widespread" activity within the meaning of the *Beauford* case. That count is therefore dismissed, with prejudice.

The court plainly has jurisdiction over the remaining cross-claims against the individual defendants. Federal Rule of Civil Procedure 13(g) permits the assertion of cross-claims against co-parties "arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein." Cross-claims may include "a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

Rule 13(g) "is construed liberally so as 'to avoid multiple suits and to encourage the determination of the entire controversy among the parties before the court with a minimum [of] procedural steps.'" *State Teachers Retirement Bd. v. Fluor Corp.,* 589 F.Supp. 1268, 1269–70 (S.D.N.Y.1984)

(quoting 6 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 1431 at 161 (1971)).

■ The court need not have an independent basis of federal jurisdiction to consider a cross-claim under Rule 13(g). If the cross-claim is sufficiently related to the main claims, it falls within the court's ancillary jurisdiction. *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798, 811 (2d Cir.1979); *R.M. Smythe & Co. v. Chase Nat'l Bank,* 291 F.2d 721, 724 (2d Cir.1961); 6 C. Wright & A. Miller, *supra,* § 1433 at 177.

Under Federal Rule of Civil Procedure 18(a), "a party asserting a proper cross-claim within Rule 13(g) may join with it as many independent, unrelated cross-claims as he has against an opposing party...." *First Nat'l Bank of Cincinnati v. Pepper,* 454 F.2d 626, 635 (2d Cir.1972). Cross-claimant need therefore only assert one cross-claim that passes muster under Rule 13(g) in order to bring all the rest before this court under Rule 18(a).

Citing *Federman, supra,* at 812, cross-claim defendants argue that a proper cross-claim must be logically related to the original claim and involve identical facts and the same proof. The test for ancillary jurisdiction over cross-claims in this Circuit is not that restrictive. The *Federman* case indicates that no one factor is conclusive. *Id.* Rather, the court must determine (1) whether the complaint and the cross-claim arise out of "'a common nucleus of operative facts,'" and (2) whether the policies of "'judicial economy, convenience, and fairness to litigants' are furthered by the assumption of jurisdiction." *Stamford Bd. of Educ. v. Stamford Educ. Assoc.,* 697 F.2d 70, 72 (2d Cir.1982) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966)).

■ The complaint and the cross-claim for indemnification clearly arise from a common nucleus of operative facts. Indeed, the cross-claim is precisely of the sort envisioned by Rule 13(g). Defendants argue, however, that it fails to satisfy that

Rule because indemnification is not available for securities law violations, and because the claim seeks recovery based on settlement of the original Bernstein and Kaun actions pursuant to the Understanding and not on a judgment rendered on the claims asserted in the present action.

■ Indemnification is not available as a matter of policy to parties who have "knowingly and willfully violated the federal securities laws." *Greenwald v. American Medcare Corp.*, 666 F.Supp. 489, 493 (S.D.N.Y.1987) (citing *Globus v. Law Research Serv., Inc.*, 287 F.Supp. 188, 199 (S.D.N.Y.1968), *aff'd in pertinent part*, 418 F.2d 1276, 1288–89 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970)). But Crazy Eddie claims to be entirely without fault in having committed any violations for which it may be found liable. Indeed, Crazy Eddie was powerless to act except through some or all of the individual defendants.

If Crazy Eddie can prove that cross-claim defendants acted " 'with actual knowledge of falsity or reckless disregard for the truth,' " they may be required to indemnify it for liability it incurs as a result of their actions. *See Arden Way Assocs. v. Boesky*, 664 F.Supp. 863, 865 (S.D.N.Y.1987) (quoting *Odette v. Shearson, Hammill & Co., Inc.*, 394 F.Supp. 946, 954 n. 9 (S.D.N.Y.1975)), and cases cited. Whether cross-claim defendants acted with the requisite state of mind is, of course, a question of fact to be determined at trial.

It is true that the claim for indemnification states that "[a]s a direct and proximate result of Crossclaim Defendants' breach of their fiduciary duties ..., [Crazy Eddie] has been named as a defendant in this action and as a result has agreed to settle the plaintiffs' claims against [it] for a substantial amount." The Understanding having been rescinded, that basis for liability no longer exists. However, the count can be amended to seek indemnification for any payment to plaintiffs for which Crazy Eddie may ultimately settle or be found liable in this action as a result of cross-claim defendants' acts. The court will thus dismiss the count, with leave to amend it.

If cross-claimant chooses to amend the claim for indemnification, that count will be sufficient to satisfy Rule 13(g).

Even if the cross-claim for indemnification is not amended, however, the remaining cross-claims—those asserting fraud, neglect, breach of fiduciary duties, and breach of contract—also share with the complaint "a common nucleus of operative facts" and fall within Rule 13(g). They relate to the individual defendants' and Peat Marwick's derelictions of duty in committing essentially the same acts alleged in the complaint. To require Crazy Eddie to litigate here the issue of whether the individual defendants and Peat Marwick exposed it to liability, but to litigate elsewhere whether this exposure was due to fraud, neglect, breach of fiduciary duty, or breach of contract, would hardly further the policies of judicial economy, convenience, and fairness to litigants that underlie Rule 13(g).

Peat Marwick argues that the cross-claim for breach of contract fails to state a claim under New York law because it properly sounds in tort, not contract, and because it fails to allege any injury compensable in tort or contract.

Peat Marwick contends that *Carr v. Lipshie*, 8 A.D.2d 330, 187 N.Y.S.2d 564 (1st Dep't 1959), *aff'd*, 9 N.Y.2d 983, 218 N.Y.S. 2d 62, 176 N.E.2d 512 (1961), establishes that under New York law there is no cause of action sounding in contract for breach of a duty of due care. That case held that a complaint against an accountant for failing to discover false entries made by plaintiff's bookkeeper sounded in tort, not contract, and thus fell within the shorter statute of limitations for tort actions. That case was followed in *Adler & Topal, P.C. v. Exclusive Envelope Corp.*, 84 A.D.2d 365, 446 N.Y.S.2d 337 (2d Dep't 1982), and more recently in *In re Wedtech Corp.*, 81 B.R. 240 (S.D.N.Y.1987).

Cross-claimant responds that the *Carr* line of cases was overruled in *Video Corp. of America v. Frederick Flatto Assocs., Inc.*, 58 N.Y.2d 1026, 462 N.Y.S.2d 439, 448

N.E.2d 1350 (1983), which held that "an action for failure to exercise due care in the performance of a contract insofar as it seeks recovery for damages to property or pecuniary interests recoverable in a contract action" is governed by the longer statute of limitations for contract actions. The court added: "To the extent that ... *Adler & Topol* ... [is] to the contrary [it] should not be followed." *Id.*, 58 N.Y.2d at 1028, 462 N.Y.S.2d at 439, 448 N.E.2d at 1350. Cross-claimant argues that the *Wedtech* case failed to appreciate this recent change in New York law.

The court agrees that *Video Corp.* overruled the *Carr* case. *See also, e.g., Sinopoli v. Cocozza*, 105 A.D.2d 743, 743, 481 N.Y.S.2d 177, 178 (2d Dep't 1984); *Baratta v. Kozlowski*, 94 A.D.2d 454, 461–62, 464 N.Y.S.2d 803, 809 (2d Dep't 1983). Although the recent cases did not involve accountants, they concerned analogous claims against other professionals, such as lawyers, *see Sinopoli, supra,* insurance brokers, *see Video Corp., supra,* and architects, *see Sears, Roebuck & Co. v. Enco Assoc., Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *Paver & Wildfoerster v. Catholic High School Assoc. of N.Y.,* 38 N.Y.2d 669, 382 N.Y.S.2d 22, 345 N.E.2d 565 (1976). The language of the cases is quite sweeping, indicating clearly that the *Adler & Topol* case, which relies explicitly on the *Carr* case, *see Adler & Topol, supra,* 84 A.D.2d at 367–68, 446 N.Y.S.2d at 339, both of which involved accountants, is no longer controlling.

In the *Wedtech* case cited by cross-claim defendants, Judge Sand held that a contract theory did not apply against Wedtech's former accountants because "nothing alleged here suggests that [the accountant] guaranteed a specific result that it failed to produce." 81 B.R. at 242. Judge Sand's reasoning would apply equally, however, to the contractual theory of legal malpractice advanced in the *Sinopoli* case. In that case the plaintiff claimed that the attorney had failed to exercise due care in providing legal services, and the New York Court of Appeals held that the statute of limitations for contract actions applied.

It thus appears that the recent New York cases treat the exercise of due care as an implicit term of contracts for the provision of professional services, for breach of which a remedy may be had in contract. The court therefore rejects Peat Marwick's position that the cross-complaint fails to state a claim.

Peat Marwick argues that the cross-complaint does not allege injury to Crazy Eddie properly compensable either in contract or in tort. As to the contract claim, it contends that Crazy Eddie's injuries are merely "vicarious" and "derivative" of those suffered by plaintiffs, who were not parties to any contract between Crazy Eddie and Peat Marwick.

Peat Marwick has not cited any authority suggesting that Crazy Eddie's liability to plaintiffs, to the extent that it is caused by Peat Marwick's alleged breach of contract, is not compensable as consequential damages. Cross-claimant " 'may recover as damages ... only such as would naturally arise from the breach itself, or those that might reasonably be supposed to have been contemplated by the parties when the contract was made.' " *Motif Construction Corp. v. Buffalo Savings Bank,* 50 A.D.2d 718, 719, 374 N.Y.S.2d 868, 870 (4th Dep't 1975) (quoting *Orester v. Dayton Rubber Mfg. Co.,* 228 N.Y. 134, 137, 126 N.E. 510 (1920)); *see Deutsch v. Health Ins. Plan of Greater N.Y.,* 751 F.2d 59, 67–68 (2d Cir.1984); *Starmakers Pub. Corp. v. Acme Fast Freight, Inc.,* 646 F.Supp. 780, 782 (S.D.N.Y.1986). Liability of a corporation to purchasers of its shares naturally arises from the breach of an accountant's duty of due care to the corporate client in connection with public offerings. The effect of Peat Marwick's opinion on those purchasers was undoubtedly contemplated by the parties when the contract was made. That liability, whether established at trial or resolved through settlement, is certainly an injury to the corporation and foreseeable to Peat Marwick. The cross-complaint thus properly alleges injury from breach of contract.

As to the tort claim, Peat Marwick claims that the cross-complaint fails to allege any injury to it directly and proximately flowing from Peat Marwick's purported negligence. It argues that cross-claimant should have made instead a claim for contribution.

▮ Under New York law, the test for proximate cause is whether it was reasonably foreseeable that the consequences complained of would follow from the allegedly wrongful act. *E.g., Saugerties Bank v. Delaware & Hudson Co.*, 236 N.Y. 425, 430, 141 N.E. 904 (1923). Where the wrongful act is a failure to perform a duty and performance of the duty would have prevented the harm, causation is established, at least where the harm was reasonably foreseeable in the event of a dereliction. *Harper v. Remington Arms Co.*, 156 Misc. 53, 56, 280 N.Y.S. 862 (1935), *aff'd*, 248 A.D. 713, 290 N.Y.S. 130 (1st Dep't 1936).

▮ Cross-claimant alleges that but for Peat Marwick's dereliction of duty, it would not have incurred liability to plaintiffs or injury to its business reputation, its going-concern value, and its creditworthiness. Injuries of this type are reasonably foreseeable consequences of an accountant's failure to review a public company's financial statements properly. The pleading is sufficient to allow cross-claimant to attempt to prove these damages at trial. Although cross-claimant might perhaps have made a claim for contribution, the court will not dismiss the claim it made solely because another might have been asserted.

The motions to stay the cross-claims are premised on a purported need to await the determination of the motions to dismiss the complaint and of a motion for class certification. The former argument is moot. The latter involves the theory that the Understanding assigns Crazy Eddie's claims to plaintiffs, allowing Crazy Eddie to proceed through discovery as the effective representative of the plaintiff class without having obtained representative status from the court. Since the Under-standing has been rescinded, that argument is also moot.

## IV. THE MOTION TO DISMISS THE THIRD–PARTY COMPLAINT

The third-party complaint by Crazy Eddie against several of its former employees states in three counts claims for civil conspiracy, RICO conspiracy, and indemnification. Each count alleges that third-party defendants knew of and assisted in the fraudulent acts committed by the individual defendants.

Three of the third-party defendants, Jean Cocchiara, Kathleen G. Morin, and Eddie H. Gindi, move to dismiss the third-party complaint for failure to state a claim, failure to plead fraud with particularity, and improper impleader. They also move to disqualify Crazy Eddie's counsel and for Rule 11 sanctions.

### A. *The Motion to Dismiss the Third–Party Complaint*

Count One of the complaint brings claims for civil conspiracy. Third-party defendants assert that there is no cause of action for civil conspiracy under New York law. Crazy Eddie responds that Delaware law applies and permits actions for civil conspiracy.

Count One alleges, in substance, that third-party defendants conspired to assist the individual defendants in fraudulently breaching their fiduciary duties to Crazy Eddie.

▮ Under New York's choice of law rules, the law of the state of incorporation governs issues of corporate fiduciary obligations. *See, e.g., Davidge v. White*, 377 F.Supp. 1084, 1088 (S.D.N.Y.1974) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969)). Crazy Eddie is incorporated in Delaware. Since Delaware law will determine whether the individual defendants breached their fiduciary obligations to Crazy Eddie, Delaware law should determine whether third-party defendants conspired with them to assist in that breach.

Under Delaware law, beneficiaries of a trust relationship may sue for civil conspiracy "a third party who knowingly participates in the breach of a fiduciary's duty." *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del.Ch.1984); *see Laventhol Krekstein Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del.Super.1976). The elements of a civil conspiracy claim are: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by a party not in direct fiduciary relationship; and (4) damages. *Gilbert, supra*, at 1057. All four elements are alleged in the third-party complaint.

Count Two asserts a claim for civil conspiracy under RICO, 18 U.S.C. § 1962(c) and (d), alleging that third-party defendants conspired with the individual defendants to participate in conducting Crazy Eddie's affairs through a pattern of racketeering activity. For the reasons discussed in connection with the complaint and the cross-complaint above, the RICO count does not state a claim upon which relief may be granted and is dismissed, with prejudice.

Count Three asserts a claim for indemnity. Third-party defendants argue that it fails to state a claim because Crazy Eddie contributed to the wrong that caused plaintiffs' injuries and because indemnity is not available for securities law violations. These arguments are unavailing for the reasons stated concerning the cross-complaint.

Third-party defendants urge that the third-party complaint is not a proper impleader under Federal Rule of Civil Procedure 14. That Rule provides that a defendant may implead against "a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him." Fed.R.Civ.P. 14(a). The Rule is to be liberally construed so as to promote judicial efficiency. *See, e.g., Givoh Assocs. v. American Druggists Ins. Co.*, 562 F.Supp. 1346, 1350 (E.D.N.Y.1983); *Argonaut Ins. Co. v. Halvanon Ins. Co.*, 545 F.Supp. 21, 23 (S.D.N.Y.1981). Impleader is proper if the liability of the third-party defendant is " 'in some way dependent on the outcome of the main claim.' " *Prudential Ins. Co. v. BMC Indus., Inc.*, 113 F.R.D. 100, 102 (S.D.N.Y.1986) (quoting 6 C. Wright & A. Miller, *supra*, § 1446 at 246 (1976)).

In this case the liability of third-party defendants is clearly dependent on the outcome of the original action and the cross-claim. If Crazy Eddie escapes liability to plaintiffs or the individual defendants are exonerated, there will be no claim against third-party defendants. If, on the other hand, the individual defendants are proven to have committed the frauds alleged in the various complaints, it would be fatuous to require a separate trial of third-party defendants' participation in those frauds. Contrary to third-party defendants' contention, impleader against an employee of a corporate defendant is permissible. *See, e.g., Rodriguez v. United States Lines Co.*, 181 F.Supp. 95, 96 (S.D.N.Y.1960). The third-party complaint is therefore a proper impleader.

Although sufficient in other respects, the third-party complaint fails to plead fraud with the particularity required by Rule 9(b). It does not particularize any activities by which the third-party defendants aided and abetted the individual defendants or any facts constituting the requisite scienter.

The third-party complaint makes the critical allegations on information and belief. Cocchiara, the Director of Internal Audit for Crazy Eddie, is alleged on information and belief to have known "that inventory count sheets were being falsified and/or destroyed at the direction of" the individual defendants and to have "helped conceal the unlawful conduct" of the individual defendants by destroying records. Gindi, the Acting Controller, is alleged upon information and belief to have "participated in the scheme to inflate the physical inventory" and in the destruction of records. Morin, the Director of Accounts Payable, is alleged upon information and belief to have "facilitated and associated in the falsification of debit memos and physical inventory by failing to take any action to prevent or

otherwise expose" the individual defendants' unlawful conduct.

The third-party defendants were lower-ranked employees whose jobs allegedly exposed them to the individual defendants' wrongdoings and gave them the opportunity to participate in those acts. But Crazy Eddie has not pleaded on knowledge any facts showing that third-party defendants actually availed themselves of that opportunity.

As noted in connection with the complaint, Rule 9(b) does not permit pleadings on information and belief unless the required facts are peculiarly within the opposing party's knowledge. *E.g., DiVittorio, supra,* at 1247. Moreover, the degree of particularity required depends on such factors as whether the plaintiff has had an opportunity for discovery. *Devaney, supra,* at 569.

■ In this case, Crazy Eddie has conducted several interviews with Cocchiara and Morin and has had access to their testimony before the SEC. Current management has controlled Crazy Eddie for over a year and has access to all of its records. This is not a case where a claimant has had no opportunity to discover the facts underlying the claim. In the case of these third-party defendants, the court will therefore require greater specificity and allegations made on knowledge, not mere information and belief.

■ An element of the cause of action for civil conspiracy is knowing participation in the fraudulent breach of fiduciary duty. "Knowing participation" combines the knowledge of the wrongdoing and the substantial assistance in it required for federal aider and abettor liability. It means more than mere obedience to the orders of a superior. By analogy to the aider and abettor cases, the third-party complaint should plead knowledge of facts giving rise to an inference that third-party defendants participated in the fraud as something that they actively wished to make succeed. *See IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980).

Since third-party defendants do not have sufficient financial resources to make a dent in Crazy Eddie's potential liability to plaintiffs, there may well be a basis for third-party defendants' statement that the only reason for the third-party claim is to coerce them into cooperating with Crazy Eddie's discovery against the individual defendants. If this is so, the third-party complaint may have an *in terrorem* effect similar to that of a "strike suit." A goal of Rule 9(b) is to prevent unsupported allegations of fraud from serving coercive purposes. The court will therefore dismiss the third-party complaint for failure to plead fraud with particularity, with leave to amend.

Since the claims brought in the third-party complaint are not frivolous, the motion for Rule 11 sanctions is denied.

**B.** *The Motion to Disqualify Crazy Eddie's Counsel*

■ Third-party defendants argue that Crazy Eddie's counsel, Akin, Gump, Strauss, Hauer & Feld (Akin Gump), should be disqualified because an attorney from Akin Gump conducted an interview with third-party defendant Cocchiara on December 21, 1987 without telling her that Crazy Eddie's position was adverse to hers. Cocchiara claims to have been under the impression at the interview that Akin Gump was representing her and that her statements to the Akin Gump attorneys would be protected by the attorney-client privilege.

The affidavits submitted by both sides indicate that no one from Akin Gump told Cocchiara that the firm was representing her personally or behaved so as to give her that impression. Cocchiara did not reveal any incriminating information at that meeting, solicit legal advice from the Akin Gump lawyers, ask them to represent her, or in any other way manifest a belief that they represented her or a desire to have them represent her. *See United States v. Keplinger,* 776 F.2d 678, 700 (2d Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). It is quite evident that no attorney-client relationship between

Akin Gump and Cocchiara existed at the time of the meeting. The court finds no reason to disqualify Akin Gump from representation of Crazy Eddie.

## V. CONCLUSION

The motions with respect to the pleadings are granted and denied in accordance with this memorandum, with leave to amend where so indicated. The motion for Rule 11 sanctions against Crazy Eddie's attorneys is denied. The motion for disqualification of Crazy Eddie's counsel is denied.

So ordered.