## In re CRAZY EDDIE SECURITIES LITIGATION.

### No. 87 C 33.

United States District Court,
E.D. New York.

Sept. 19, 1990.

---

Sirota & Sirota (Howard B. Sirota, of counsel), Milberg, Weiss, Bershad, Specthrie & Lerach (David J. Bershad, Michael C. Spencer, of counsel), New York City, for plaintiffs.

Kronish, Lieb, Weiner & Hellman (William O'Brien, Justin N. Feldman, William J. Schwartz, Ivan Kline, of counsel), New York City, for defendant Eddie Antar.

Kaye, Scholer, Fierman, Hays & Handler (Steven Glassman, of counsel), New York City, for defendant Oppenheimer & Co., Inc.

Shearman & Sterling (Kenneth M. Kramer, of counsel), New York City, for defendant Peat Marwick Main & Co. and KMG Main Hurdman.

Davis, Markel & Edwards (Thomas J. Sweeney, III, of counsel), New York City, for defendant Peat Marwick Main & Co.

Weil, Gotshal & Manges (Dennis J. Block, of counsel), New York City, for defendants Salomon Bros., Inc., Bear Stearns & Co., Inc. and Wertheim & Co., Inc.

Beldock Levine & Hoffman (Brian E. Mass, of counsel), New York City, for defendant Isaac Kairey.

Leader & Berkon (Frederick D. Berkon, of counsel), New York City, for defendants Solomon E. Antar, Eddy Antar, Steven Pasquariello, Edmond Levy and Carl G. Zimel.

Wilson Elser Moskowitz Edelman & Dicker (Richard Oelsner, of counsel), New York City, for defendants Penn and Horowitz and J. Liebman & Co.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

The court has before it motions to dismiss portions of the "second amended consolidated and supplemental complaint," referred to hereafter as "the Complaint." The court dismissed parts of an earlier pleading, the "consolidated and amended complaint" (hereafter called "the First Complaint), by Memoranda and Orders dated December 30, 1988, *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962 (E.D.N.Y. 1988) ("the December Order"), and June 16, 1989, *In re Crazy Eddie Securities Litigation,* 714 F.Supp. 1285 (E.D.N.Y.1989) ("the June Order"). The court assumes familiarity with those decisions.

The First Complaint alleged claims by plaintiffs, as purchasers of the common stock of defendant Crazy Eddie, Inc. (Crazy Eddie), against Crazy Eddie and various of its former officers, directors, accountants, and underwriters. That pleading invoked the Securities Act of 1933 (the Securities Act), 15 U.S.C. § 77a *et seq.* (1982 & Supp. IV 1986), the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78a *et seq.* (1982 & Supp. IV 1986), the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (1982 & Supp. IV 1986), and state law.

The First Complaint asserted, among other things, that the defendants made or aided and abetted the making of materially false and misleading statements and omissions in connection with three public offerings of Crazy Eddie securities and with the sale of Crazy Eddie securities in general, causing plaintiffs to purchase the securities at a price higher than they would have paid had the truth about Crazy Eddie been known.

In substance the First Complaint asserted the following. Crazy Eddie, a New York corporation founded by Eddie Antar and controlled by the Antar family, first sold shares to the public in September 1984. Between that time and November 1987, although not in all cases throughout that period, the individual defendants were its directors or officers. During that period defendant Peat Marwick Main & Co. (Peat Marwick) and its predecessor certified the financial statements that Crazy Eddie filed with the Securities and Exchange Commission (SEC) and disseminated to the public.

Crazy Eddie made three public offerings of securities underwritten by defendants Oppenheimer & Co., Inc. (Oppenheimer), Wertheim & Co., Inc. (Wertheim), Bear, Stearns & Co., Inc. (Bear Stearns) and Salomon Brothers, Inc. (Salomon). Crazy Eddie offered shares of common stock in March of 1985 and 1986, and convertible subordinated debentures in June of 1986.

The First Complaint described the alleged participation of the defendants in (1) material misstatements and omissions in registration statements and prospectuses, (2) the employment of devices, schemes, and artifices to defraud and the making of material misstatements and omissions falsely assuring investors of Crazy Eddie's strong financial condition, and (3) the commission of violations of RICO. The court will not repeat its earlier description of the detailed facts alleged.

The Complaint, filed in October 1989, is in substantial part identical to the First Complaint, but also asserts (1) new claims under the Exchange Act, RICO, and state law regarding Crazy Eddie's first public offering of stock in September 1984; (2) new claims under the Securities Act, the Exchange Act, RICO, and state law as to private sales by Oppenheimer of Crazy Eddie stock in December 1985 and March 1986; (3) amended "control person" claims under the Securities and the Exchange Acts; (4) amended RICO claims against several individual defendants; and (5) claims against three additional individual defendants, Allen Antar, Eddie Gindi, and Kathleen Morin, and against Penn & Horowitz, an accounting firm that performed auditing and other services in the early 1980's, and its successor J. Liebman & Co. The Complaint drops Crazy Eddie now in bankruptcy, as a defendant.

In addition, the Complaint adds a new plaintiff, James R. Schwebel, an alleged purchaser of the June 1986 debentures during the class period, and repleads the Securities Act, Exchange Act and state law claims based on the offering of the debentures. The court dismissed these claims because none of the plaintiffs was a debenture holder. *See Bernstein*, 702 F.Supp. at 972.

Schwebel also filed a class action (89 CV 165) on January 17, 1989 (Schwebel Complaint), alleging claims under Section 11 and 12 of the Securities Act, Sections 10(b) and 20 of the Exchange Act, and state law against many of the defendants named in the First Complaint for misconduct relating to the sale of the debentures. The court treats Schwebel's class action as consolidated with that of plaintiffs for purposes of discovery, but will address claims raised in that complaint here.

Several individual defendants—Eddy Antar, Solomon E. Antar, Edmond Levy, Steve Pasquariello, Carl G. Zimel, and Isaac Kairey—move to dismiss portions of the Schwebel Complaint and the Complaint. The underwriters Oppenheimer, Wertheim, Bear Stearns, and Salomon, and also Peat Marwick have, by letter, joined in the individual defendants' motions. Penn & Horowitz moves to dismiss the Complaint.

The default entered against Eddie Antar (Antar) has made his motion moot.

## I. *Motions to Dismiss After Answer*

Plaintiffs argue that because a motion to dismiss a complaint for failure to state a claim "shall be made before pleading if a further pleading is permitted," Fed.R. Civ.P. 12(b), the court should not consider the letters of the underwriters and Peat Marwick submitted after the filing of answers. The letters are sufficient to join in the motions. Defendants did not waive arguments by filing answers. The court treats their motions as made pursuant to Rule 12(h)(2) for judgment on the pleadings. *See* C.A. Wright & A.R. Miller, *Federal Practice and Procedure*, § 1361 at 444 (1990); *Zebrowski v. Denckla*, 630 F.Supp. 1307, 1308 n. 1 (E.D.N.Y.1986).

## II. *The Securities Act*

Counts I through IV of the Complaint and Count I and II of the Schwebel Complaint allege violations of the Securities Act.

Count I of the Complaint says that Eddy (distinguished from Eddie) Antar, Zimel, Oppenheimer, and Peat Marwick, and other individual defendants, violated Section 11 of the Securities Act, 15 U.S.C. § 77k, by making misleading statements in the registration statements for the March 13, 1985 offering of Crazy Eddie shares and for the offerings of stock by Oppenheimer under the December 1985 and March 1986 Oppenheimer Prospectuses (the Oppenheimer Sales).

Count II claims Zimel and other individual defendants, and Peat Marwick, Wertheim, Bear Stearns, and Salomon committed similar violations for the March 7, 1986 offering of shares and the 1986 offering of debentures.

Count III asserts that Oppenheimer and several individual defendants violated Section 12(2) of the Securities Act, 15 U.S.C. § 77l(2), by making misleading statements in the March 13, 1985 offerings of stock and in the Oppenheimer Sales.

Count IV claims Wertheim, Bear Stearns, and Salomon, and several individual defendants, committed similar violations in the March 7, 1986 offering of stock and the 1986 offering of debentures.

Count I of the Schwebel Complaint asserts that Peat Marwick, Wertheim, Bear Stearns, Salomon, Eddy Antar, Zimel, and other individual defendants and Crazy Eddie violated Section 11 of the Securities Act by making misleading statements in registration statements for the 1986 debenture offering.

Count II of the Schwebel Complaint claims that the defendants named in Count I violated Section 12(2) of the Securities Act by making misstatements in the 1986 debenture offering.

### A. Eddy Antar in Count II of the Complaint

Eddy Antar urges that, because Count II of the Complaint omits his name from the sub-caption and from the paragraph stating against whom the count is brought, the court should dismiss the count as to him. The court elsewhere describes Eddy Antar as having committed the alleged violations. Clearly the count gave notice of a claim against him. Plaintiffs may amend to add his name where needed.

### B. The Tracing Requirement

■ Eddy Antar, Zimel, Oppenheimer and Peat Marwick contend that the Complaint insufficiently alleges "tracing" of the purchase of their shares to the March 13, 1985 offering and the Oppenheimer Sales. *See Barnes v. Osofsky*, 373 F.2d 269, 271–73 (2d Cir.1967). Eddy Antar, Zimel, Peat Marwick, Wertheim, Bear Stearns and Salomon make a similar argument as to the tracing allegations (a) in the Complaint with respect to the March 7, 1986 stock offering or the 1986 debenture offering, and (b) in the Schwebel Complaint with respect to 1986 debenture offering.

The court held that under Section 11 or 12, while plaintiffs need not prove, they must allege that their shares are traceable to the 1985–86 offerings. *Bernstein*, 702 F.Supp. at 972.

The four counts of the Complaint state that plaintiffs "purchased or otherwise acquired Crazy Eddie securities issued pursuant to and traceable to those defective Reg-

istration Statements." While it would have been more informative if plaintiffs had at least pleaded the dates on which they bought their shares, the court will not find the general allegation insufficient. Defendants may move for summary judgment if the facts so justify.

The Schwebel Complaint fails to allege that the convertible debentures Schwebel purchased were traceable to the 1986 debenture offering. The court dismisses the Securities Act claims with leave to replead facts tracing the purchase to the debenture offering.

C. Statute of Limitations

Section 13 of the Securities Act, 15 U.S.C. § 77m, bars Section 11 and 12(2) claims

unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under [Section 11] ... more than three years after the security was bona fide offered to the public ..., or under [Section 12(2)] more than three years after the sale.

i. The Oppenheimer Sales

Plaintiffs first made Securities Act claims against Oppenheimer for the Oppenheimer Sales in the Complaint filed in October 1989, over three years after those sales in December 1985 and March 1986, and more than a year after January 1988, the date plaintiffs admit they could have discovered defendants' fraud. The claims are thus time barred unless they relate back to the First Complaint filed March 1, 1988.

Rule 15(c), Fed.R.Civ.P., provides:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

An amendment will relate back if the original pleading gives the adversary "all the notice that statutes of limitations are intended to afford," namely, fair notice of "the general fact situation out of which the claim arises." J. Moore, *Moore's Federal Practice*, 15.15[3] (1989); *see Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir.1973).

In alleging material misstatements or omissions by Oppenheimer in the March 1985 offering, the First Complaint limited the misconduct charged to a failure to conduct a reasonably diligent inquiry into Crazy Eddie's business operations when preparing the offering. The pleading made no mention of the Oppenheimer Sales, which were separate transactions based on different registration statements and prospectuses.

Moreover, the First Complaint states no facts justifying an inference that Oppenheimer participated in some broader conspiracy to defraud. Indeed, the First Complaint expressly excepts Oppenheimer from the charge levelled against all of the other defendants of knowing and reckless disregard of "the truth that the Company's financial statements materially overstated its inventory and net income."

Oppenheimer thus did not get the fair notice required to relate back the present Securities Act claims based on the Oppenheimer Sales. *See FDIC v. Chizner*, 110 F.R.D. 114, 118 (E.D.N.Y.1986); *Marine Midland Bank v. Keplinger Associates, Inc.*, 94 F.R.D. 101, 104 (S.D.N.Y.1982).

Plaintiffs suggest that a so-called Standstill Agreement of May 10, 1988 between plaintiffs and Oppenheimer tolled the limitations period on the new claims. That agreement provided for Oppenheimer's dismissal from this action and a tolling of the limitations period to allow reinstatement of any claims against Oppenheimer set forth in the First Complaint. The agreement does not extend to new claims.

ii. The 1986 Debenture Offering

Eddy Antar, Zimel, Wertheim, Bear Stearns, Salomon, and Peat Marwick argue that plaintiffs' Securities Act claims based on the June 1986 debenture offering are new and therefore time barred. These claims were dismissed in the December Order for lack of standing. Because Schwe-

bel is now one of the plaintiffs, they have the requisite standing. But Schwebel first joined the plaintiffs when the Complaint was filed in October 1989. The claims based on the debenture offering were thus not made until more than a year after the Complaint states the misstatements were admittedly discoverable in January 1988.

Plaintiffs urge that these claims relate back to the First Complaint and thus are timely. Schwebel was not a plaintiff in the First Complaint. The claims cannot relate back to facts he did not previously allege.

### iii. *The Schwebel Complaint*

The Schwebel Complaint was filed January 17, 1989, less than three years after the June 1986 debenture offering, but more than a year after the November 1987 announcement by new management of the inventory shortfall. Schwebel says that he "discovered" the facts concerning defendants' wrongful conduct when the Company announced on January 19, 1988 the $65 million shortfall, and that his claims, brought within a year of this announcement, are timely.

■ A plaintiff suing under Sections 11 and 12(2) of the Securities Act must allege compliance with section 13 of the Act as part of the claims by setting forth (1) the time and circumstances of the discovery of the fraudulent statement, (2) the reasons why it was not discovered earlier (if more than one year has elapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery. *Bernstein*, 702 F.Supp. at 973.

The Schwebel Complaint asserts that in November 1987 new management took control and announced a $45 million inventory shortfall, but fails to say why Schwebel could not have discovered the false statements as to the debenture offering as early as November of 1987. The Schwebel Complaint does not set forth any efforts made to seek discovery.

■ Schwebel argues that the filing in March 1988 of the First Complaint, purporting to be on behalf of, among others, the class of debenture holders, tolled the limitations period.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), in order to prevent massive intervention in pending class actions by individuals concerned that their claims would be otherwise time barred, the Supreme Court held that the limitation period was tolled as to the individual claims of the putative class members for the period the trial court considered class certification. *American Pipe*, 414 U.S. at 552–3, 94 S.Ct. at 765–66; *Crown, Cork*, 462 U.S. at 354, 103 S.Ct. at 2398.

But the Court of Appeals for the Second Circuit has decided that this holding does not extend to tolling the limitations period for an action brought on behalf of a class after class certification has been denied or limited in a previous action. *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir.1987). In that case the court pointed out that if the pendency of a prior class action were to toll the limitations period for claims brought in a later class action, resourceful counsel could "'piggy-back one class action onto another and thus toll the statute of limitations indefinitely.'" *Id.* at 878 (citations omitted).

While *Korwek* involved a class action brought by persons excluded from a previous class certification for lack of common issues of fact or law or typical claims, *see* Fed.R.Civ.P. 23(a), the court's reasoning is equally applicable to a class action brought after a previous class action has been dismissed for lack of standing. In fact the concern is perhaps more acute where the dismissal of the first action is for lack of standing. There appears to be no good reason to encourage bringing of a suit merely to extend the period in which to find a class representative. *See In re Elscint, Ltd. Securities Litigation*, 674 F.Supp. 374, 378 (D.Mass.1987).

■ However, while the limitations period for Schwebel's class action is not tolled, the pendency of the class action did toll the period for his individual claims. *See Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F.Supp. 1180, 1192

(W.D.Mo.1983); *Cf. Hass v. Pittsburg Nat'l Bank*, 526 F.2d 1083 (3d Cir.1975).

Schwebel may have leave to amend his class complaint, if he can, to comply with the discovery requirement of section 13 of the Securities Act.

### III. *The Exchange Act*

Count IV of the Complaint asserts, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b–5 by all the defendants for fraudulent statements made during the class period from September 1984 through January 1988.

Count III of the Schwebel Complaint sets forth, among other things, similar violations of the Exchange Act by defendants Eddy Antar, Zimel, and other individual defendants, Peat Marwick, Wertheim, Bear Stearns, and Salomon, and Crazy Eddie for fraudulent statements made during the class period from June 1986 through January 1988.

### A. Statute of Limitations

The Complaint alleges that the class period commenced in September 1984, the date of the first public offering of Crazy Eddie stock. Defendants urge that the new Exchange Act claims based on the September 1984 offering or the June 1986 debenture offering are time barred. Oppenheimer contends that plaintiffs' Exchange Act claims relating to the Oppenheimer Sales are new and time barred. Defendants also say that the Schwebel Complaint's Exchange Act claims are time barred.

### i. *Data Access Issue*

■ In the December Order the court said in dicta that the reasoning of *In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.) (en banc), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), was "sound" in holding that statutes of limitations covering other sections of the Exchange Act, rather than state limitations periods, should govern Section 10(b) claims. The Court of Appeals for the Third Circuit borrowed from Sections 9(e), 18(c), and 29(b), 15 U.S.C. §§ 78i(e), 78r(c), 78cc(b), to create a limitations period of one year after the plaintiff discovers the facts constitut-ing the violation, and in no event more than three years after such violation. *Id.* at 1545, 1550; *see Bernstein*, 702 F.Supp. at 980–81. Judge Nevas in the United States District Court for the District of Connecticut agreed and applied such a federal rule rather than an analogous Connecticut statute in *Welch v. Cadre Capital*, 735 F.Supp. 467 (D.Conn.1989).

Although this court adheres to its previously expressed view, it must now consider whether the federal limitations period should be applied retroactively. The general rule is to give judicial decisions both retroactive and prospective effect. *Thorpe v. Hous. Auth.*, 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). In *Chevron Oil Company v. Huson*, 404 U.S. 97, 106–7, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), the Supreme Court held that it would apply a decision only prospectively if (1) it established a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) retaining the old rule solely for the pending case would not further retard the new rule's purpose and effect; and (3) applying the new rule retroactively would be substantially inequitable.

Furthermore, where it is of the opinion that the Court of Appeals or the Supreme Court will adopt a new rule, the District Court, with becoming modesty, must also consider how likely it is that its prediction will come true and that the appellate court will apply the new rule retroactively. If there is some doubt that the Court of Appeals will do so, the interests in preserving judicial resources and preventing retrial of the same action warrants continued application of the existing rule.

Because Section 10(b) contains no express statute of limitations period, the courts in this Circuit have for some years applied the analogous limitations period of the forum state, including that state's borrowing statute. *See Armstrong v. McAlpin*, 699 F.2d 79, 86–87 (2d Cir.1983); *Heineman v. S & S Machinery Co.*, 707 F.Supp. 86, 88 (E.D.N.Y.1989); *Azurite*

*Corp. Ltd. v. Amster & Co.,* 730 F.Supp. 571, 582 (S.D.N.Y.1990) (and cases cited); *Metropolitan Securities v. Occidental Petroleum Corp.,* 705 F.Supp. 134, 138 (S.D. N.Y.1989); *Huang v. Sentinel Government Securities,* 709 F.Supp. 1290, 1301 n. 10 (S.D.N.Y.1989) (dicta).

A strong case can be made that plaintiffs should have anticipated the likelihood that a new limitations period would be applied. Before the date plaintiffs assert they knew of the fraud, the Supreme Court had undermined the rationale for adopting the state rule in Section 10(b) claims. *See DelCostello v. International Bd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The likelihood was increased when *Data Access* came down. However, in this circuit only this court's opinion and that of Judge Nevas have approved the *Data Access* reasoning adopting the federal rule.

In light of the earlier decisions of the Court of Appeals for the Second Circuit and the holdings of the District Court for the Southern District continuing to apply the state limitations period, this court considers that the plaintiffs reasonably relied on the rule. The Court of Appeals may not adopt a federal standard or may not apply it retroactively. This court will therefore not apply the federal rule retroactively. The existing precedent for adopting the state limitations period for common law fraud to Section 10(b) claims brought in this district distinguishes this case from *Welch, supra,* in which the appropriate state limitations period for actions brought in Connecticut on Section 10(b) claims was far from clear.

■ The next question is whether the plaintiffs' new Exchange Act claims or Schwebel's Exchange Act claims are time barred under the state rule. Defendants note that, under the state rule, for actions brought in this court by residents of New York for injury suffered in state, the relevant New York limitations period is six years from the time the fraud occurred and within two years from the time the fraud was or with reasonable diligence should have been discovered (the New York Rule). *McAlpin, supra,* 699 F.2d 79, 86–87 (2d Cir.1983).

If the plaintiffs were non-residents and the claim accrued outside New York, this court, applying the New York borrowing statute, New York Civil Practice Law and Rules § 202, would adopt any shorter limitations period applied in the other state. *See Heineman,* 707 F.Supp. at 88.

As neither the Schwebel Complaint nor the Complaint alleges the residency of any of the plaintiffs, the court will assume that at least several of the named plaintiffs are New York residents injured in state and apply the New York Rule. If the Exchange Act claims of individual non-resident plaintiffs or Schwebel would, in fact, be time barred under the applicable limitations period of the outside state, defendants may make an appropriate motion for summary judgment.

ii. *Applying Rule 15(c), Fed.R.Civ.P.*

■ Plaintiffs argue that, even if the court applies the borrowing statute and other states have shorter limitations periods than the New York Rule, the new claims made by these plaintiffs based on the September 1984 offering and the Oppenheimer Sales "relate back" to the timely claims filed in the First Complaint and are timely.

As noted above, whether or not new claims of misrepresentations as to a defendant relate back depends on whether the First Complaint gave that defendant fair notice.

The First Complaint alleged, among other things, that Crazy Eddie and the individual defendants "knowingly and recklessly disregarded the fact that the information contained in the press releases, quarterly and annual reports of Crazy Eddie during the Class Period overstated Crazy Eddie's inventory and understated its cost of sales, thereby materially overstating reported net income" during that period from March 20, 1985 through November 1987. Those alle-

gations, among others, were sufficient to give those individual defendants notice that they were charged with a continuing conspiracy to defraud the investing public during the period. They thus had fair notice of the general fact situation out of which the claims of misrepresentations arose during the class period.

The First Complaint alleges that Peat Marwick certified all the "financial statements of Crazy Eddie filed with the SEC and disseminated to the public" during the class period. Because of Peat Marwick's involvement with Crazy Eddie during the class period, its preparation of financial statements throughout the period, and plaintiffs' allegations that Peat Marwick participated in a continuing conspiracy, it had fair notice of the facts supporting claims of fraud based on financial statements released during the period.

The First Complaint limits the allegations of fraud by Oppenheimer to one public stock offering in March 1985. For the reasons given above, Oppenheimer did not have fair notice of a possible claim of broader fraud. *See Chizner,* 110 F.R.D. at 118 (E.D.N.Y.1986).

Schwebel was not a plaintiff and Penn & Horowitz was not a named defendant in the First Complaint. None of the claims against Penn & Horowitz or those brought by Schwebel relate back to that Complaint.

Similarly, Levy was mentioned only in the lead caption of the First Complaint. The First Complaint alleges no facts or claims against him. None of the Complaint's Exchange Act claims against Levy relates back.

### iii. *Applying the Limitations Rule*

All plaintiffs' new Exchange Act claims and the Schwebel Complaint's Exchange Act claims subject to the New York Rule are timely. In any event, the new Exchange Act claims (except those brought by Schwebel) arising during the class period from March 1985 through November 1987 against Peat Marwick and the moving individual defendants (except Levy) are timely as they relate back to the First Complaint.

Penn & Horowitz argues that any fraud with which it could possibly be implicated occurred more than six years before the claims against it were filed in the Complaint in October 1989. Thus it asserts that, even if the New York Rule is applied, the claims against it are time barred.

Count VI of the Complaint alleges that Penn & Horowitz "substantially assisted the fraud and participated in the conspiracy" "by knowingly or recklessly failing to conduct proper audits of Crazy Eddie in accordance" with generally accepted accounting principles. The Complaint states that Penn & Horowitz audited the financial statements prepared by the management of Crazy Eddie for the fiscal years ended May 1980 through 1982. It last issued an audit report on September 12, 1982. That report represented that Crazy Eddie's consolidated financial statements as audited for the fiscal years ended May 31, 1980, 1981 and 1982 presented fairly the financial position of Crazy Eddie during that period. The Complaint further alleges that this "report was reproduced with Penn and Horowitz's knowledge and consent in September 1984 and March 1985 prospectuses."

As plaintiffs argue that the wrongdoing by Penn & Horowitz was not the filing of the audit reports in 1980–1982, but instead permitting Crazy Eddie to use the September 1982 report in the September 1984 and March 1985 prospectuses after failing to make proper audits, plaintiffs' claim is timely under the New York Rule.

Penn & Horowitz also argues that plaintiffs should have discovered its involvement in the fraud in January 1987, when the initial action was filed against Crazy Eddie. Because this filing date was more that two years before plaintiffs filed the Complaint against Penn & Horowitz in October 1989, it argues that the claims are time barred under the New York Rule. However, as this court held in the December Order, the wrongdoing was reasonably alleged not to be discoverable until new management disclosed the fraud in November 1987, less than two years before plaintiffs filed the Complaint.

iv. *Pleading the 10(b) Claim Against Kairey and Penn & Horowitz*

▮ Kairey moves for reconsideration of the court's previous holding that plaintiffs properly alleged all the elements of securities fraud under the Exchange Act and pled them with the particularity required by Rule 9(b), Fed.R.Civ.P. Kairey's arguments were considered and rejected, and are no more persuasive now.

Penn & Horowitz argues that plaintiffs' claims under Section 10(b) of Exchange Act for primary and aiding and abetting liability are not pled with the particularity required Rule 9(b), Fed.R.Civ.P.

In the December Order, the court detailed the nature and extent of detail required by Rule 9(b) and will not repeat that discussion here. In summary, the court stated that defendants must be apprised of the false statements, by whom and when they were made, in what manner the statements were false, how they misled the plaintiff, and what defendants obtained as a result of the fraud. *Bernstein*, 702 F.Supp. at 976.

Plaintiffs argue that Penn & Horowitz "misstated" Crazy Eddie's financial condition when it permitted the other defendants to use the September 1982 audit report in the September 1984 and March 1985 prospectuses.

Even if the publication constitutes a new statement, the Complaint fails to allege in what manner the statement was false. It alleges that the individual defendants began their scheme to manipulate sales sometime in 1982. But the court has no grounds to draw an inference that Penn & Horowitz's audits for 1980 and 1981 were in any way false. Nor does the Complaint suggest that sales were manipulated before the 1982 fiscal year ended in May 1982 from which the court might infer that September 1982 audit report contained misstatements.

The Complaint also offers no facts from which to infer any gain Penn & Horowitz may have received from allegedly giving consent to use the audit report. In the December Order the court noted that Peat Marwick may have benefited from its alleged role in the preparation of the allegedly misleading statements by retaining the continued patronage and goodwill of its client. The same cannot be said of Penn & Horowitz which was no longer employed by Crazy Eddie at the time it allegedly consented to the use of the audit report in the prospectuses.

Plaintiffs thus fail to allege with particularity a claim for primary violation of Section 10(b) of the Exchange Act.

▮ Moreover, plaintiffs' allegations are insufficient to establish aider and abettor liability under Section 10(b). To establish aiding and abetting liability under the securities laws requires (1) a security violation by a primary wrongdoer, (2) knowledge of the wrongdoing, and (3) substantial assistance in the primary wrongdoing. *Bernstein*, 702 F.Supp. at 978. Because Penn & Horowitz was apparently not an insider in the Company when the alleged misstatements were made by the other defendants between 1984–1987, the court cannot infer from the facts alleged a knowledge of those misstatements or how Penn & Horowitz substantially assisted the fraud.

Plaintiffs' Exchange Act claims are dismissed as to Penn & Horowitz with leave to replead.

## IV. *Control Person Liability*

### A. The Complaint

▮ Defendants Eddy Antar, Solomon Antar and Zimel argue that the Complaint fails to state a claim in Count V for "control person" liability under Section 15 of the Securities Act, 15 U.S.C. § 77o. These defendants and Pasquariello, Levy, and Kairey also argue that the Complaint fails to state a claim in Count IV for "control person" liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

As noted in the December Order, Section 15 provides, in pertinent part, that persons who control a person liable under Sections 11 or 12 are jointly and severally liable with the controlled person. Section 20(a) imposes similar liability on those who control a person liable under any section of the

Exchange Act. *See, Bernstein,* 702 F.Supp. at 979.

The purpose of these sections is "to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973). In addition to stating a primary violation of the securities laws and knowledge of the wrong, the pleading must allege that defendant had the power to exercise control over the primary violator, based on a special relationship such as agency or stock ownership. *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y.1985).

In the December Order the court concluded that the First Complaint clearly alleged that Eddie Antar was a control person. He allegedly set all policy for Crazy Eddie, made the most important decisions, signed the SEC filings, approved reports to shareholders and press releases, installed family and friends as officers and directors, and controlled Crazy Eddie. *Bernstein, supra,* 702 F.Supp. at 979. However, the court said these "sweeping allegations preclude[d] the possibility that any of the other defendants exercised control over Crazy Eddie within the meaning of sections 15 or 20(a)." *Id.* The court dismissed this count as to all defendants except Antar.

The Complaint now alleges that Antar, Sam Antar, Mitchell Antar, Eddy Antar, Sam E. Antar, Scott, Solomon E. Antar, Pardo, Gindi, Zimel and Panoff were control persons under the Securities Act and that all the individual defendants violated section 20 of the Exchange Act.

Insofar as the Complaint distinguishes between the relative influence of the individual defendants, it broadly alleges that "Antar, Sam Antar, Mitchell Antar, Sam E. Antar, Isaac Kairey, and Gindi set policy for Crazy Eddie, made important decisions for the Company, signed filings made by the Company with the SEC and reviewed and approved reports to shareholders and Company press releases."

The Complaint also alleges that Mitchell Antar, Sam E. Antar and Kairey took over and ran the Company after Antar resigned as president in December 1986. However, these allegations are insufficient to establish control person liability as to Kairey. The Complaint's more specific allegations of his misconduct show that he was more controlled, than controlling, and merely carried out orders for Antar or Sam E. Antar.

The Complaint alleges few facts illustrating misconduct by Eddy Antar, Solomon Antar, Pasquariello, Levy or Zimel.

Solomon Antar, the Company's secretary and general counsel, allegedly received favorable treatment on a company loan in October 1987, profited from sales of stock, signed registration statements, and knew of the wrongdoing. Zimel, a director and member of the Company's Audit Committee of the board, allegedly knew the company was disseminating false information and was involved in management of the Company because of his close contacts with Antar. Eddy Antar, Pasquariello and Levy allegedly "skimmed receipts" and participated "in schemes to manipulate the 'same store' sales figures reported by Crazy Eddie so as to create the appearance of favorable increasing trends" under the direction of Antar.

Such allegations do not establish that these defendants exercised any dominion over the other defendants, much less control sufficient to impose joint and several liability. Plaintiffs' Section 15 and 20(a) claims for control person liability are dismissed as to Kairey, Eddy Antar, Solomon Antar, Pasquariello, Levy and Zimel.

**B. The Schwebel Complaint**

The Schwebel Complaint alleges "control person" liability against all defendants named in that action under section 20(a) of the Exchange Act. The Schwebel Complaint alleges that at "all relevant times" Antar set all policy for Crazy Eddie and made the most important decisions for the Company, signed filings with the SEC, reviewed and approved reports to shareholders and Company press releases and installed his family and friends as the Company's

other officers and directors. He "dominated and controlled Crazy Eddie at all relevant times." For the reasons explained in the December Order, the Schwebel Complaint makes out a claim against Antar alone. Schwebel has leave to replead as to the other named defendants.

## V. RICO Claims

■ Count VII of the Complaint alleges that Solomon E. Antar, Eddy Antar, Kairey, Pasquariello, and Levy, and other individual defendants, violated §§ 1962(c) and (d) of RICO. These defendants contend that the RICO claims against them should be dismissed for failing to plead fraud with particularity as required by Rule 9(b), Fed. R.Civ.P.

Section 1962(c) prohibits any person from conducting the affairs of an enterprise "through a pattern of racketeering activity." A "pattern of racketeering activity" requires the commission of at least two predicate acts of racketeering activity. 18 U.S.C. § 1961(5). Racketeering activity includes mail fraud and fraud in the sale of securities. 18 U.S.C. § 1961(1).

Section 1962(d) prohibits a conspiracy to violate §§ 1962(a)–(c).

In the June Order, the court dismissed plaintiffs' RICO claims for failing to plead the predicate acts with "particularity." The First Complaint did not detail "the particular misstatements and omissions alleged to have been made in corporate disclosures" among the listed "predicate acts." *In re Crazy Eddie*, 714 F.Supp. at 1293. Moreover, most of the predicate acts alleged were not racketeering activities. The paragraphs cited as "predicate acts" did not "specify the documents or categories of documents in which fraudulent statements were made or when they were made." *Id.* Because many of the "individual defendants were not officers for much of the Class Period" and it was unclear from the First Complaint when the securities frauds took place, there were "no facts from which an inference as to each defendant's participation and knowledge" could be drawn. *Id.*

The Complaint now defines the predicate acts in paragraphs 101–124. Those paragraphs incorporate by reference paragraphs 49–92, which detail each alleged misrepresentation made by the defendants beginning with the September 1984 stock offering prospectus, and including registration statements, press releases and other prospectuses over the three year period concluding with the Form 10–Q issued in October 1987.

Paragraphs 101–124 also allege, among other things, that (1) the individual defendants "participated in the generation of false, deceptive and misleading material" described in paragraphs 49–92 for dissemination to the investing public (¶ 102), and used the "mails and telephones in conspiring to commit the acts" of securities fraud alleged (¶ 102); (2) Eddy Antar, Pasquariello, Levy and others engaged in schemes to manipulate the Company's same store sales figures to show increasing sales trends, including depositing checks into store accounts in 1986 and 1987 from receipts that had been skimmed from the stores in 1982 and 1983 to create the impression that large retail purchases had been made, recording wholesale sales as retail sales, and altering sales documents to conceal the fraud (¶¶ 103–105); (3) during the last quarter of fiscal 1987, with the "knowledge and encouragement of Kairey," Panoff falsified documents recording the return of merchandize to manufacturers so as to understate the company's payables and overstate inventory by approximately $1 million (¶ 115); (4) Kairey and others discussed and ordered "throwing away the Massapequa inventory records and then blaming employees," thus destroying much of the evidence of the fraudulent scheme (¶ 116); (5) Kairey followed Sam E. Antar's instructions in March 1987 and ordered the shipment of inventory to certain stores so as to "more closely resemble what the Company had reported in its inventory summary reports" (¶ 116); (6) the defendants "shredded an enormous mass of corporate records in the days or weeks before new management took control" to conceal the fraud (¶ 121); (7) Eddy Antar, Pasquariello, Kairey, Levy and others knew they were "preparing and disseminating false, deceptive

and misleading information" and did so to enrich themselves through either the sale of their stock or employment benefits (¶ 122); and (8) Kairey and others "set policy for Crazy Eddie, made important decisions for the Company, signed filings made by the Company with the SEC and reviewed and approved reports to shareholders and Company press releases" (¶ 124).

The Complaint further alleges that Eddy Antar, formerly Secretary and Treasurer of the Company, was a director from May 1984 to November 1987 (¶ 20). Solomon E. Antar, Pasquariello, Levy, and Kairey were all members of the Company's Board of Directors from December 1986 until November 1987. These five defendants were thus directors during a period in which at least five alleged misstatements (one annual report and two quarterly statements and two press releases) were issued to the public.

Their position as directors, coupled with the Complaint's allegations of misconduct against Eddy Antar, Pasquariello, Levy, and Kairey, is sufficient to raise an inference that these four defendants knew of and participated in at least those misstatements made during their tenure as directors. Because no specific allegations of misconduct are made against Solomon E. Antar, there is no basis for a similar inference as to him. The Complaint does not plead a RICO claim against him.

The individual defendants challenge the constitutionality of RICO, arguing that the "pattern" requirement is unconstitutionally vague. Those courts that have considered the issue have found the statute constitutional, *see, e.g., United States v. Robinson,* 1990 WL 77780 (N.D.Ill. May 17, 1990); *Norstar Bank v. Pepitone,* 742 F.Supp. 1209 (E.D.N.Y.1990); *United States v. Thevis,* 474 F.Supp. 134, 139 (N.D.Ga.1979), *aff'd,* 665 F.2d 616 (5th Cir.1982); *United States v. Stofsky,* 409 F.Supp. 609, 613–614 (S.D.N.Y.1973); *United States v. Field,* 432 F.Supp. 55, 58 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1371 (2d Cir.1978), and this court agrees. Defendants cite no authority to the contrary.

Plaintiffs § 1962(c) claim is proper against Eddy Antar, Pasquariello, Levy and Kairey, but dismissed against Solomon E. Antar.

The court does not determine whether plaintiffs' allegations are sufficient to state predicate acts of wire or mail fraud against Eddy Antar, Pasquariello, Levy and Kairey.

■ Defendants further contend that plaintiffs fail to state a claim under § 1962(d) because they do not allege with particularity an "agreement" by each defendant to commit acts constituting a violation of § 1962(c). However, the sufficiency of the pleading of this RICO conspiracy claim is not subject to the higher pleading standard of Rule 9(b), Fed.Rule Civ.P. *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal, and Rosenberg,* 651 F.Supp. 877, 883 (D.Conn.1986).

The court can draw the inference that Eddy Antar, Pasquariello, Levy, and Kairey agreed with each other or other defendants to participate in the predicate acts of securities fraud. Plaintiffs' § 1962(d) claims are proper as against these defendants.

The plaintiffs' claim is dismissed against Solomon E. Antar, as the plaintiffs' § 1962(c) claim against him has been dismissed.

### VI. *Pendent State Claims*

Having dismissed plaintiffs' federal claim against Penn & Horowitz with the leave to replead, the court dismisses plaintiffs' state law claims against that defendant with leave to replead if plaintiffs replead the federal claim.

### VII. *"Scandalous" Allegations Against Antar*

■ Pursuant to Rule 12(f), Fed.Rule Civ.P., Wertheim, Bear Stearns, Salomon and Oppenheimer move to strike certain allegations made in paragraphs 138(a), (b), and (e) of the Complaint as they are "scandalous" and "irrelevant" to the issue of whether the underwriters properly conducted "due diligence" before making the various offerings. Those paragraphs provide:

(a) Antar was a high school dropout and lacked the education to manage a large public company. He associated with known organized crime figures, including Charlie Morris, a convicted felon and former bodyguard for Mafia boss "Crazy Joey" Gallo. Antar employed, in a trusted capacity as a senior manager, at least one member of Morris's immediate family. Both Gallo and Morris were subsequently shot and killed in separate mob-style assassinations. Antar himself was stabbed in an unsolved incident prior to the public offerings.

(b) Antar behaved erratically, frequently and without any explanation disappearing for days or even weeks at a time, and refusing upon his return to explain his disappearances. When present at the Company's offices, Antar was usually unshaven, unkempt, dressed in a sweat suit, and accompanied by his dog, frequently exploded into rages in which he screamed obscenities and threatened others with physical violence.

(e) The Prospectus failed to disclose that Antar's first foray into the retail electronic business, with a store known as Sights & Sounds ERS, located in Brooklyn, New York, failed and closed within one year of the store's opening and that Sam Antar was forced to pay the debts which Antar had incurred in the limited time Antar operated Sights & Sounds.

Rule 12(f) provides, in pertinent part, that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Plaintiffs cannot seriously contend that the underwriters should have disclosed speculations of Antar's association with allegedly "known" organized crime figures more than eleven years prior to the first public offering. As there is no allegation that Morris's family member did anything illegal, there is no reason to include Antar's relationship with that person. Nor do plaintiffs offer any explanation why it would be surprising or informative to investors that a New York businessman, a victim of a stabbing, might wish to go to work dressed in a sweat suit accompanied by his faithful dog.

The court finds no need for plaintiff to make allegations as to Eddie Antar's educational background, work and personal habits and ability to run a business. They may be relevant but are hardly appropriate for a pleading. Defendants' motion to strike these allegations is granted.

## VIII. *Summary*

Defendants motions to dismiss are granted in the following respects.

### i) The Complaint

The Securities Act claims against Oppenheimer based on the Oppenheimer Sales are time barred. The Securities Act claims against Eddy Antar, Zimel, Wertheim, Bear Stearns, Salomon, and Peat Marwick based on the 1986 debenture offering are time barred. The Exchange Act claims against Penn & Horowitz are dismissed for failure to plead fraud with particularity with leave to replead. The control person claims under the Securities and the Exchange Acts against Kairey, Eddy Antar, Solomon Antar, Pasquariello, Levy and Zimel are dismissed with prejudice. The RICO claims against Solomon E. Antar are dismissed with prejudice. Paragraphs 138(a), (b) and (e) of the Complaint are stricken. The court dismisses the state law claims against Penn & Horowitz with leave to replead if plaintiffs replead the federal claim.

### ii) The Schwebel Complaint

The Security Act claims against Peat Marwick, Wertheim, Bear Stearns, Salomon, Eddy Antar, and Zimel are dismissed for failure to (1) plead "discovery" adequately and (2) allege facts tracing the purchase of the debentures to the 1986 offering, with leave to replead. The claims for control person liability are dismissed as to all defendants, except Antar, with leave to replead. The motions are otherwise denied.

So ordered.